T.C. Memo. 2003-135

UNITED STATES TAX COURT

COMTEK EXPOSITIONS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5130-00.                    Filed May 13, 2003.

Frank Agostino, for petitioner.

Gerald A. Thorpe and Edward Laubach, Jr., for respondent.


MEMORANDUM OPINION

BEGHE, Judge:  This case is before the Court fully stipulated under Rule 122.[1]  The stipulation of facts and attached exhibits are incorporated herein by this reference.

_____

[1]Unless otherwise specified, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years at issue.

Respondent determined the following deficiencies, additions, and penalties with respect to petitioner's Federal income taxes:

| TYE July 31 | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|---|
| 1995 | $3,872,347 | $960,069.25 | $774,469.40 |
| 1996 | 5,405,717 | 1,072,572.62 | 1,081,143.40 |

After giving effect to various concessions,[2] the issues remaining for decision are:

1. Whether petitioner and Crocus International (Crocus) were engaged in a joint venture or joint ventures to conduct trade shows in the former Soviet Union (collectively, the foreign trade shows) during the last 7 months of the fiscal year ended July 31, 1995 and during the fiscal year ended July 31, 1996. Our holding that petitioner and Crocus were not engaged in any joint venture forecloses the question of how joint venture profits should be allocated between them.

2. In the alternative, whether and in what amounts petitioner is entitled to business expense deductions for the last 7 months of the fiscal year ended July 31, 1995 and for the fiscal year ended July 31, 1996, for amounts paid or payable to Crocus as compensation for its services in operating the foreign trade shows in addition to deductions already allowed petitioner

---

[2]Petitioner has conceded, among other things, its liability for additions to tax under sec. 6651(a)(1) and accuracy-related penalties under sec. 6662(a) for the taxable periods in issue on any underpayments finally determined.

for payments in reimbursement of Crocus's direct expenses of operating such shows.  We hold that petitioner is entitled to deduct as additional business expenses the amounts of exhibition fees paid to Crocus by exhibitors located in the former Soviet Union and retained by Crocus as compensation for its services in operating the foreign trade shows.

Factual Background

In October 1990, Comtek Expositions, Inc. (petitioner), was incorporated in Connecticut and commenced business.  At all relevant times, petitioner has been a C corporation.  At the time petitioner filed the petition in this case, its principal place of business was in Wilton, Connecticut.  During the taxable periods at issue, petitioner used the accrual method of accounting.

During the taxable periods at issue, petitioner's stockholders and their respective ownership interests were as follows:

| Stockholder | Ownership Percentage |
|---|---|
| Aras Agalarov (Agalarov) | 33.33 |
| Leonid Pollak (Pollak) | 26.67 |
| Michael Tseytin (Tseytin) | 26.67 |
| Boris Kogan (Kogan) | 13.33 |

The stockholders are parties to a stockholders' agreement (the stockholders' agreement), which recites that petitioner has issued and outstanding 200 shares of corporate stock held by the

four stockholders in amounts consistent with the stipulated ownership percentages shown above. However, the stockholders' agreement contains some internal inconsistencies and discrepancies with stipulated facts. The first two lines of the stockholders' agreement recite that it is "dated as of this ___ day of ___, 1993"; the month and date in 1993 are left blank. The last two lines of the stockholders' agreement prior to the signatures recite "IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written." Attached to the stockholders' agreement is an "Exhibit B, Certificate of Stated Value" valuing the 200 shares of the corporation at $25,000 per share--a total of $5,000,000--that is "Dated: As of December, 31, 1992". Petitioner's Forms 1120, U.S. Corporation Income Tax Return, state that Agalarov and Kogan did not become stockholders until August 1, 1993, or thereafter.[3]

The stockholders' agreement not only contains restrictions on the transfer of shares, rights of first refusal, and purchase options and obligations of the type usually found in agreements among stockholders of closely held corporations; it also contains provisions effectuating the stockholders' and petitioner's expressed "desire to promote their mutual interest by agreeing

---

[3]On petitioner's Forms 1120, U.S. Corporation Income Tax Return, for the taxable years ended July 31, 1992 and July 31, 1993, Pollak and Tseytin are each listed as owning 50 percent of the shares of petitioner.

that the business and affairs of the corporation shall be conducted subject to the terms and conditions hereof."  Among the actions that can be taken only by unanimous vote of the Board of Directors are:  "(i) obligating the Corporation to participate in any exhibition or exposition; * * * [and] (v) entering into any extraordinary agreement or incurring any extraordinary expense not in the usual and regular course of business * * *".

Article 10 of the stockholders' agreement, entitled "Agreement Regarding Revenues", provides "that the 'net profits' (as defined herein)[4] to the Corporation from its exhibition and exposition operations shall be allocated to the Stockholders" under three different scenarios, depending on where "the exhibition or exposition takes place".  Kogan's percentage of net profits under the three scenarios is always less than 20 percent of net profits and equal to one-half of Pollak's and Tseytin's percentages, which are always equal to each other.  Under the three scenarios, Agalarov's percentages of net profits vary to include 50 percent of net profits for trade shows in the former Soviet Union, 10 percent of net profits for trade shows in Romania, and 20 percent of net profits for trade shows in the United States.  The stockholders' agreement does not refer to or

---

[4]The last sentence of Article 10 of the stockholders' agreement provides:  "For purposes hereof, the term net profits means the gross revenues from the operations of the Corporation less all cost and expenses and taxes."

otherwise reconcile the inconsistency between the percentages of stock ownership, on the one hand, and the agreement for allocations of percentages of net profits from trade shows to the stockholders, on the other. The stockholders' agreement also contains no provision for payment of the net profits of the trade shows allocated to the stockholders, whether by payments as dividend distributions with respect to stock, by payments of compensation to stockholder-officers, or in some other fashion. In any event, petitioner has never declared a dividend. In addition, Schedule E, Compensation of Officers, for each of petitioner's Forms 1120 in evidence for prior years, as well as the taxable periods at issue, shows compensation paid to the stockholder-officers as "None".

From 1990 through July 31, 1996, petitioner conducted trade shows and exhibitions primarily in the former Soviet Union[5] with Crocus, a Russian joint-stock company solely owned by Agalarov.

---

[5]The stipulation of facts states that foreign trade shows at issue were conducted in former Soviet Bloc countries. We may disregard stipulations between parties where justice requires if the evidence contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). The record discloses that all trade shows at issue in this case were conducted in the former Soviet Union. Although trade shows were also conducted in Romania, a former Soviet Bloc country that was not part of the Soviet Union, the trade shows in Romania are not at issue in this case. We therefore disregard the parties' stipulation and find that foreign trade shows at issue in this case were conducted in the former Soviet Union.

There is no express reference in the stockholders' agreement to Crocus or its role in putting on trade shows.

From 1990 through July 31, 1996, Crocus's business activities included organizing, marketing, and presenting trade shows and exhibitions in the former Soviet Union. During this period, Crocus also engaged in other unrelated business activities.

During 1994, 1995, and 1996, Crocus maintained offices in Moscow; Crocus did not maintain an office or transact business in the United States. During 1994, 1995, and 1996, petitioner maintained no office in Russia.

Petitioner and Crocus leased exhibition space and facilities for trade shows from Expocentr, a Russian joint-stock company. Expocentr owned or controlled the Krasnaya Presnya exhibition complex in Moscow where many trade shows were held.

From 1990 through July 31, 1996, petitioner and Crocus had no written agreement governing their business or financial relationships. At all times relevant, neither petitioner nor Crocus controlled how the other conducted its business activities. At all times relevant, petitioner and Crocus were free to compete against each other in the trade show business. However, no foreign trade shows were organized by either petitioner or Crocus unless both petitioner and Crocus agreed to put on the trade show.

Most of the exhibitors at the foreign trade shows were U.S. companies, European subsidiaries of U.S. companies, and a few Asian companies. Some Russian companies also participated in the foreign trade shows. The foreign trade shows were usually organized by product line, such as computers and computer software, food, or clothing.

Pre-January 1, 1995, Foreign Trade Shows

Before January 1, 1995, petitioner would secure commitments prior to the foreign trade shows from companies located in the United States and elsewhere to lease space from petitioner at the exhibition site to display their goods and services. Petitioner's employees attended other trade shows in the United States and Europe to solicit exhibitors for foreign trade shows; they also prepared sales brochures that were given to prospective exhibitors and advertised proposed trade shows in trade journals. Both the "Comtek" and "Crocus" names were used in the promotional materials and advertising.

Trade show exhibitors located outside the former Soviet Union paid their exhibition fees either by check payable to petitioner or by wire transfer to a bank account controlled by petitioner. Trade show exhibitors located in the former Soviet Union paid their exhibition fees to Crocus.

Trade show exhibitors located outside the former Soviet Union entered into contracts for exhibition space with

petitioner. These contracts were signed by a representative of the exhibitor and a sales person employed by petitioner. The contracts provided that if the exhibitor were to cancel the contract, petitioner would retain all payments received as liquidated damages.

Generally, petitioner's employees handled all contacts with potential trade show exhibitors located outside the former Soviet Union. In some cases, a potential exhibitor from outside the former Soviet Union would instruct petitioner's employees to contact the exhibitor's business agent in Russia; in such a case, employees of Crocus would contact the business agent to see whether that company wished to participate in the foreign trade show. However, in those cases, petitioner still collected the exhibition fees.

Crocus supplied some or all of the following services to exhibitors at foreign trade shows: Security (general, overnight, and special); exhibit construction (including design assistance, furniture assembly, and exhibition assembly and mounting); exhibit maintenance and cleaning; exhibit demolition (including exhibit dismantling, transportation, and storage); trade show plumbing, electric, and telecommunications services (including installation and connection of exhibit lighting, telephones, and faxes); trade show exhibitor relations (including hotel and automobile assistance); trade show food and beverages services;

trade show signs and flagging; local advertising and printing (including exhibitor manuals and show catalogues); relations with Expocentr; exhibition custom clearance; exhibition finance; and first night party for exhibitors in the Kremlin.

Petitioner's employees attended foreign trade shows and solicited exhibitors to participate in future trade shows. Petitioner's employees also provided liaison between exhibitors and Crocus's employees when exhibitors encountered problems.

Foreign trade show fees received by petitioner were first used to reimburse petitioner and Crocus for their direct expenses and any overhead allocable to foreign trade shows.

Post-December 31, 1994, Foreign Trade Shows

On January 1, 1995, petitioner, Crocus, and MBL International (MBL) entered into a reciprocal royalty agreement (the royalty agreement) with E.C.I. Management Services, Ltd. (ECI), a nonresident Irish corporation.[6]  In his declaration in support of petitioner's motion for summary judgment, Alexander

---

[6]There is no stipulation of fact or any other information in the record that identifies MBL.  The royalty agreement does not specify what role Crocus or MBL would play in putting on trade shows or sharing trade show receipts and profits.  Crocus's and MBL's only role in the royalty agreement was to agree to a debt offset provision.  Article 4.7 of the royalty agreement recites that MBL and Crocus are each indebted to Comtek, that Comtek is indebted to ECI in the amounts set forth in Schedule A of the royalty agreement, and that ECI accepts the obligations of MBL and Crocus as "partial payment" of Comtek's obligation to ECI. The stated Schedule A amounts of the debts of MBL and Crocus to Comtek, $3,791,183.80 and $1,576,574.42, respectively, exactly equal Comtek's stated debt to ECI, $5,367,758.22.

Bortzov (Bortzov), the deputy managing director of Crocus, explained Crocus's view of the business rationales behind the royalty agreement. Bortzov declared:

9. By 1995, the existing arrangement was unsatisfactory to Crocus. Crocus was dissatisfied because it believed that Comtek was collecting exhibitor fees and using them to pay expenses of the United States trade shows and the United States operation before reimbursing Crocus for its expenses.

10. Crocus also perceived that Comtek's United States overhead allocations to the foreign Trade Shows were unreasonable considering the limited nature of the services provided by Comtek.

11. Comtek, for its part, complained that it believed that Russian expenses were becoming too great a percentage of Trade Show receipts. Comtek's United States' shareholders accused Crocus of not using absolute best efforts to reduce Crocus direct expenses.

12. Finally, Comtek never fully understood (a) how difficult it was to do business in Russia or (b) that dealing with quasi-government agencies in Russia is a sensitive mixture of politics, negotiation, and money. However, it was my understanding that everyone involved agreed that ECI's participation in the Trade Shows would facilitate the conduct of the Trade Shows, including the allocation of space from Expocentr.

13. Crocus recommended that Comtek and Crocus enter into an agreement with ECI to facilitate the conduct of future Russian Trade Shows.

Like the stockholders' agreement, the royalty agreement contains internal inconsistencies and discrepancies with stipulated facts. First, Article 3.2 of the royalty agreement designates ECI as "payment agent" to receive all payments of fees for trade shows outside the United States, while all fees for trade shows in the United States are to be remitted to

- 12 -

petitioner.  The royalty agreement says nothing about fees to be collected by Crocus.  After December 31, 1994, trade show exhibitors located outside the former Soviet Union either paid their exhibition fees by check in U.S. currency payable to petitioner or by wire transfer in U.S. currency to a bank account in the name of ECI, while exhibitors located in the former Soviet Union continued to pay their exhibition fees to Crocus.  During the taxable periods at issue, i.e., January 1, 1995 through July 31, 1996, 90 percent of the fees for exhibition space at foreign trade shows were paid by exhibitors located outside the former Soviet Union, and the remaining 10 percent were paid by exhibitors located in the former Soviet Union.[7]

Second, under Article 4.1 of the royalty agreement, ECI agrees to pay petitioner a royalty of 25 percent of gross revenues of foreign trade shows, while under Article 4.2 of the royalty agreement, petitioner agrees to pay ECI a royalty of 35 percent of gross revenues from trade shows in the United States conducted after March 1, 1995.  Petitioner reported 25 percent of gross revenues from foreign trade shows in accordance with Article 4.1., except in cases where the foreign trade show was conducted solely by petitioner.  Petitioner reported 100 percent of gross revenues from trade shows in the United States conducted

---

[7]The parties have not stipulated the relevant percentages for foreign trade shows conducted before Jan. 1, 1995.

after March 1, 1995, which contradicts Article 4.2 of the royalty agreement.

Third, the royalty agreement contains a debt offset provision pursuant to which ECI agrees to accept MBL's and Crocus's debt obligations to petitioner as payment of petitioner's debt obligation to ECI. The provision states that petitioner's obligation to ECI exceeds the amounts MBL and Crocus owe petitioner. However, Schedule A of the royalty agreement states that the total of MBL's and Crocus's debts to petitioner is exactly equal to petitioner's debt to ECI.[8]

During 1995 and 1996, the stockholders of ECI were Fallon Nominees, Ltd. (Fallon), and Management Nominees, Ltd. (Management). Petitioner claims that none of its officers or stockholders owns shares of or otherwise controls ECI, Fallon, or Management or knows who owns or controls Fallon or Management. John Fitzgerald, a director of ECI, declared in an exhibit to the declaration of Frank Agostino (petitioner's counsel) in support of petitioner's motion for summary judgment, that petitioner had no direct or indirect control over ECI, and there was no identity or overlap of ownership between petitioner and ECI. However, under Article VI of the royalty agreement, petitioner has rights of first refusal over any of ECI's stock that ECI intends to assign, transfer, or dispose of.

---

[8]See _supra_ note 6.

After December 31, 1994, petitioner and Crocus continued to conduct trade shows and perform the underlying responsibilities related thereto in the same general manner they had before January 1, 1995. Specifically, Crocus continued to supply some or all of the same services to the exhibitors at foreign trade shows as it had supplied to exhibitors at such shows conducted before January 1, 1995.

On August 8, 1995, petitioner and Crocus signed contracts (the trade show contracts) with Expocentr to conduct three foreign trade shows at pavilions owned by Expocentr. The trade show contracts evidence contractual terms with respect to leasing pavilions owned by Expocentr. Although Crocus was a party to each trade show contract, under paragraph 9 of each of the trade show contracts, petitioner alone would be responsible for final settlement of accounts with Expocentr including remitting payments for rent, insurance, and advances to Expocentr. If there was any balance owed to or any amount due from Expocentr, petitioner alone was required to pay the balance or receive the credit. The trade show contracts do not refer to any joint venture between any of the parties.

On September 15, 1995, petitioner and Crocus signed a cooperation agreement with Expocentr (the cooperation agreement) that outlined their general understanding how future foreign trade shows would be conducted in Expocentr pavilions. The

cooperation agreement does not refer to any joint venture between any of the parties.

The total gross revenue from exhibition fees for the foreign trade shows held during the last 7 months of the fiscal year ended July 31, 1995, was $13,071,216, and for the foreign trade shows held during the fiscal year ended July 31, 1996, was $20,687,586.

Lease payments were made to Expocentr totaling $3,143,873 for foreign trade shows held during the last 7 months of the fiscal year ended July 31, 1995, and $7,003,947 for foreign trade shows held during the fiscal year ended July 31, 1996.  Receipts from foreign trade shows held from December 31, 1994 through July 31, 1996, were used to make these lease payments.

Factoring in adjustments to gross receipts agreed to by petitioner and respondent and disregarding receipts from trade shows conducted solely by petitioner and from shows conducted outside the former Soviet Union, foreign trade shows held from December 31, 1994 through July 31, 1995, produced the following net profit:

| | |
|---|---:|
| Gross exhibition revenues | $13,071,216 |
| Less:  Crocus's direct expenses substantiated | 3,310,605 |
| Less:  Expocentr rent payments substantiated | 3,143,873 |
| Less:  Petitioner's direct expenses | 2,345,509 |
| Net Profit | 4,271,229 |

Factoring in adjustments to gross receipts agreed to by petitioner and respondent and disregarding receipts from trade

shows conducted solely by petitioner and from shows conducted
outside the former Soviet Union, foreign trade shows held during
the taxable year ended July 31, 1996, produced the following net
profit:

```
Gross exhibition revenues                          $20,687,586
Less:  Crocus's direct expenses substantiated        4,003,930
Less:  Expocentr lease payments substantiated        7,003,947
Less:  Petitioner's direct expenses                  3,563,363
   Net Profit                                        6,116,346
```

On its Federal income tax returns for the taxable years
ended July 31, 1995 and July 31, 1996, petitioner reported as
income 25 percent of gross receipts from foreign trade shows held
after December 31, 1994, in accordance with the royalty agreement
and deducted trade show expenses it incurred directly.  Taking
into account adjustments to gross receipts agreed to by
petitioner and respondent and disregarding receipts from foreign
trade shows conducted solely by petitioner and from trade shows
conducted outside the former Soviet Union, petitioner reported
net income of $922,295 from the stipulated $4,271,229 net profit
for foreign trade shows held from December 31, 1994 through July
31, 1995 (25 percent of gross revenues, amounting to $3,267,804,
minus petitioner's direct expenses of $2,345,509) and net income
of $1,608,534 from the stipulated $6,116,346 net profit for
foreign trade shows held during the fiscal year ended July 31,
1996 (25 percent of gross revenues, amounting to $5,171,897,
minus petitioner's direct expenses of $3,563,363).  In so doing,

petitioner did not deduct any expenses incurred by Crocus, nor did petitioner deduct the lease payments for use of the Expocentr pavilion or any other pavilion located in the former Soviet Union.

Petitioner and Crocus did not file Forms 1065, U.S. Partnership Return of Income, for any taxable years ending on or before July 31, 1996. Crocus was not required to file and did not file U.S. corporation income tax returns for the 1994, 1995, and 1996 taxable years.

Procedural Background

On February 8, 2000, respondent issued a notice of deficiency to petitioner for the taxable years ended July 31, 1995 and July 31, 1996. Respondent's primary determination germane to the issues in this case was that petitioner's gross income for the 7-month period ended July 31, 1995 and for the fiscal year ended July 31, 1996, should be increased to include the 75 percent of gross receipts that had been paid to or received by ECI from petitioner and exhibitors in foreign trade shows in accordance with Articles 3.2 and 4.1 of the royalty agreement. The petition and answer were timely filed.

On January 2, 2001, respondent filed his first request for admissions and attached exhibits; on January 31, 2001, petitioner filed its first request for admissions. Responses to the respective first requests for admissions were filed by petitioner

on February 2, 2001, and by respondent on February 26, 2001. Both parties admitted that the Internal Revenue Service (IRS) was pursuing a criminal investigation of petitioner's stockholders.[9] Petitioner believed the investigation may have been related to its stockholders' relationships with ECI or its owners. Petitioner's stockholders interposed their Fifth Amendment privilege to respondent's discovery requests of petitioner. Consequently, petitioner asserted it had insufficient information to either admit or deny certain of respondent's requests for admissions.

On February 2, 2001, respondent filed his application for a letter of request authorizing a foreign deposition under the United Kingdom Evidence (Proceedings in Other Jurisdictions) Act 1975 to preserve foreign-based bank records of Barclays Bank PLC relating to an account held in the name of ECI and to discern the identity of ECI's owners.[10]  On February 5, 2001, petitioner filed its objection to respondent's application for a foreign deposition.  On February 8, 2001, the Court granted respondent's application for a letter of request authorizing a foreign

---

[9]The record does not disclose whether the IRS has completed its criminal investigation of petitioner's stockholders.

[10]Respondent claims ECI is a foreign corporation that conceals its business operations and its beneficial owners.  John Fitzgerald, a director of ECI, declared petitioner has no direct or indirect control over ECI and there is no identity or overlap of ownership between petitioner and ECI.  Petitioner also claimed that none of its officers or stockholders knows who owns or controls ECI.

deposition. For reasons not disclosed by the parties, respondent did not proceed with the foreign deposition.

On February 8, 2001, petitioner filed its motion for summary judgment. Petitioner's position in the motion for summary judgement was that respondent could not ignore ECI's separate legal existence and include in petitioner's gross income amounts paid to ECI by petitioner and exhibitors in foreign trade shows in accordance with Articles 3.2 and 4.1 of the royalty agreement.

On November 20, 2001, the parties submitted the case to the Court fully stipulated under Rule 122 in a document entitled "First Stipulation of Facts" that included not only stipulations of fact and attached exhibits, but also stipulations of settled issues, the opposing contentions of the parties, and a set of ground rules to be observed by the Court in deciding the case as the parties have presented it.[11]

In three separate paragraphs, the stipulation of facts document sets forth the opposing contentions and the ground rules as follows:

> 12. * * * Petitioner alleges that Crocus and it orally agreed to a 50-50 split of the net profits from the trade shows held in Russia and in the other former Soviet Bloc countries. * * *
>
> * * * * * * *
>
> 20. Before January 1, 1995, * * * The net profits, if any, [of foreign trade shows after

---

[11]The parties have not submitted any additional or supplemental stipulation of facts.

reimbursement to petitioner and Crocus of their direct expenses and overhead allocable to foreign trade shows] were * * * divided either equally between petitioner and Crocus (petitioner's position) or between Aras Agalarov (50%) and the other three shareholders of Comtek (50%) (respondent's position).

\* \* \* \* \* \* \*

27. The parties stipulate that both ECI and the royalty agreement should be disregarded for federal income tax purposes. Respondent concedes that if the foreign trade show receipts are treated as gross income received by petitioner, then petitioner is entitled to deduct the foreign trade show expenses that were paid from the trade show receipts treated as gross income to the extent that such expenses have been substantiated * * *. This would include trade show expenses paid by ECI directly and trade show expenses Crocus paid for which it was reimbursed through ECI. The parties agree that no adverse inference should be drawn against either of them based on the ECI [royalty] agreement. The parties agree that the Court may characterize the relationship between petitioner and Crocus vis-a-vis the foreign trade shows based solely on this Stipulation of Facts and the Exhibits attached hereto and the opposing party's admissions filed in this case. The parties reserve the right to object on relevancy grounds to any proposed finding of fact based on the admissions.

The sole issue in dispute is how Crocus and petitioner should report the income generated by the foreign trade shows. Petitioner contends that, if the ECI [royalty] agreement is ignored, then it and Crocus were joint venturers in the foreign trade shows during the years at issue and that the trade show profit should be divided either equally (i.e., 50% petitioner, 50% Crocus) or that profits should be allocated based on each party's payment of trade show expenses. If the Court finds that petitioner and Crocus were engaged in a joint venture during the years at issue and that they agreed to split equally the net profits from the foreign trade show business, respondent concedes that such an allocation of the net profits would have "substantial economic effect" under I.R.C. § 704(b)(2). Alternatively, if the Court determines that petitioner must report all of the gross receipts, then petitioner contends that it is entitled to a deduction for the 50%

profit allegedly paid to Crocus by ECI from the trade show receipts. Respondent contends that petitioner must report all the trade show income, less trade show expenses paid by Crocus and ECI, and is not entitled to reduce net income for any profit split with Crocus. Respondent further contends that petitioner has not produced sufficient evidence that it and Crocus were ever engaged in a joint venture or ever agreed that there should be a split of the net profits from the foreign trade shows.

On January 16, 2002, the Court deemed moot petitioner's motion for summary judgment because the parties had stipulated that both ECI and the royalty agreement should be disregarded for Federal income tax purposes.

Discussion

Petitioner has the burden of showing that the determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[12] That this case has been submitted fully stipulated does not obviate petitioner's burden of proof. Rule 122(b). We are mindful of the teaching of Burnet v. Houston, 283 U.S. 223, 228 (1931), that difficulties of proof

---

[12]Sec. 7491(a), in certain instances, places the burden of proof on respondent with respect to examinations of returns commencing after July 22, 1998. Both petitioner and respondent agreed that "In 1998 Revenue Agent Lois Petzig of the Connecticut-Rhode Island District was assigned to the audit of Comtek's 1994 and 1995 tax returns." Since there is no evidence in the record regarding the exact date in 1998 the examination of petitioner's returns commenced, and since petitioner has at no time contended that the provisions of sec. 7491(a) are applicable, the burden of proof remains on petitioner. See Estate of Fung v. Commissioner, 117 T.C. 247, 253 (2001).

do not relieve the taxpayer from the need to satisfy its burden of proof.

Income is taxed to the person who earned it.  Lucas v. Earl, 281 U.S. 111 (1930).  The sole issue in dispute is how petitioner should report taxable income generated by foreign trade shows held after December 31, 1994.  According to the stipulation of the parties and the terms of the royalty agreement, petitioner was supposed to receive 25 percent of gross receipts and pay its direct expenses out of these receipts, and ECI was supposed to receive the remaining 75 percent of gross receipts and make payments to Crocus and to Expocentr and other pavilion lessors in the former Soviet Union.  Inasmuch as the parties have stipulated that the royalty agreement is to be disregarded for Federal income tax purposes, the question is whether petitioner is entitled to exclude or deduct from gross income of foreign trade shows conducted after December 31, 1994, any amounts in excess of Crocus's and petitioner's direct expenses and Expocentr rent payments, which, the parties have stipulated, petitioner is entitled to deduct in computing its taxable income for the periods at issue.

Petitioner contends Comtek and Crocus were in a joint venture or a series of joint ventures to conduct the foreign trade shows during the taxable periods at issue.  Petitioner further contends that joint venture profits should be split

between petitioner and Crocus in proportion to their respective direct expenses, or failing that, the net profits should be split equally.

If the Court should hold there was no joint venture and therefore include in petitioner's income all gross revenue from foreign trade shows, petitioner requests a deduction under section 162(a)(1)--in addition to its stipulated deductions for its direct expenses, Expocentr rent payments, and Crocus's reimbursed direct expenses--for amounts paid or payable to Crocus as a markup on Crocus's direct expenses as additional compensation for Crocus's services in operating the foreign trade shows. Petitioner argues that the Court should estimate the markup under the Cohan rule (Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930)) and requests that the markup equal at least 50 percent of net profits. Under either argument, petitioner requests the Court to allocate to each of petitioner and Crocus at least $2,135,614.50 (50 percent of $4,271,229 net profit) for the last 7 months of the fiscal year ended July 31, 1995, and at least $3,058,173 (50 percent of $6,116,346 net profit) for the fiscal year ended July 31, 1996.

Respondent argues that petitioner and Crocus did not conduct any joint venture during the taxable periods at issue. Respondent contends Crocus should not receive any markup as compensation for its services because Crocus was the alter ego of

Agalarov. Instead, respondent urges us to disregard the corporate entities of petitioner and Crocus and view the transactions at the stockholder level, in accordance with Article 10 of the stockholders' agreement, under which petitioner's net profits of foreign trade shows conducted in the former Soviet Union are allocated 50 percent to Agalarov, with the other 50 percent split between Pollak, Tseytin, and Kogan.[13] Under respondent's theory, all gross receipts and expenses should be allocated to petitioner, which would leave petitioner with net profit of $4,271,229 for the last 7 months of the fiscal year ended July 31, 1995, and net profit of $6,116,346 for the fiscal year ended July 31, 1996.

We hold there was no joint venture between petitioner and Crocus in conduct of foreign trade shows during the taxable periods at issue. We interpret the parties' stipulation of facts to find that the foreign trade show fees paid to Crocus by exhibitors located in the former Soviet Union have been included in petitioner's stipulated gross income; we also find that Crocus retained such fees. We hold that petitioner is entitled under section 162(a)(1) to deduct such fees collected and retained by Crocus as compensation for the services of Crocus in operating the foreign trade shows.

---

[13]In so doing, respondent disregards the provisions of Art. 10 of the stockholders' agreement that provide different allocations for the U.S. and Romanian trade shows of 20 and 10 percent, respectively.

Before setting forth the reasoning to support our holdings, we make some preliminary observations, all having to do with the artificial situation created by the parties' stipulation to disregard the royalty agreement and ECI and the accompanying obscurity, lack of transparency, and incompleteness of the stipulated record regarding the business and financial relationships of petitioner and Crocus during the taxable periods at issue.

First, there is a significant omission from the stipulation of facts.[14] Unlike the stipulation with respect to foreign trade shows conducted before January 1, 1995, which states that petitioner reimbursed Crocus for its direct expenses and its overhead expenses, the stipulation of facts states that if petitioner must report all of the gross receipts from foreign trade shows conducted after December 31, 1994, petitioner is entitled to deduct "trade show expenses Crocus paid for which it was reimbursed through ECI." The stipulation of facts does not define "trade show expenses". Petitioner failed to substantiate that Crocus was reimbursed for its overhead expenses. The stipulation of facts states the amounts of Crocus's "direct

---

[14]If we should hold that petitioner and Crocus were engaged in a joint venture or joint ventures and agreed that net profits should be allocated between them in the same proportion as payments of foreign trade show expenses, the parties have not expressly stipulated that such allocation would have substantial economic effect. This omission is academic, inasmuch as we have concluded that petitioner and Crocus did not engage in a joint venture or joint ventures.

expenses substantiated" that may be deducted from gross income by petitioner; the amounts of Crocus's overhead expenses are not included in the stipulation of facts.

Second, in their briefs, petitioner and respondent each argue that net profits for foreign trade shows conducted after December 31, 1994, should be split in the same way net profits for pre-January 1, 1995, foreign trade shows were split. Paragraph 20 of the stipulation of facts states that petitioner contends that any net profits of pre-January 1, 1995, foreign trade shows were divided equally between petitioner and Crocus, whereas respondent contends that Crocus received nothing more than the reimbursement of its direct expenses and overhead. Respondent contends that petitioner received all net profits from pre-January 1, 1995, foreign trade shows, which were divided at the stockholder level of petitioner with Agalarov entitled to 50 percent of such net profits and the remaining 50 percent divided between Pollak, Tseytin, and Kogan. In addition, petitioner contends that it and Crocus orally agreed to an equal split of net profits from foreign trade shows conducted from 1990 to 1996.

Unlike the stipulations with respect to foreign trade shows conducted during the taxable periods at issue, the record does not provide enough information regarding the amount of net profits for the periods before January 1, 1995, to resolve the contentions of the parties. Petitioner and respondent did not

present business and financial records for the periods before January 1, 1995, that state how petitioner reported fees collected by Crocus from exhibitors located in the former Soviet Union and the amount or percentage of fees collected by Crocus from such exhibitors. Also, the record does not disclose information regarding payments for leasing exhibition space in the former Soviet Union during these periods. Petitioner has provided no documentary or testimonial evidence that petitioner and Crocus had orally agreed to an equal split of net profits from pre-January 1, 1995, foreign trade shows.

Petitioner's and respondent's opposing contentions with respect to revenue or profit sharing between petitioner and Crocus or Agalarov for periods before January 1, 1995, are not agreed facts; instead they pose a hypothetical issue that might have a bearing on this case if we were prepared to make inferences about whether and how petitioner and Crocus would have agreed to alter their pre-January 1, 1995, business arrangements.

We do not resolve the disagreement between petitioner and respondent about whether and how petitioner and Crocus agreed to split net profits for pre-January 1, 1995, foreign trade shows. The record fails to provide evidence to resolve the respective contentions of petitioner and respondent, and resolution of this issue is not a prerequisite to our resolution of the case.

Third, agreeing in the stipulation of facts to disregard the royalty agreement and ECI for Federal income tax purposes, the parties have left the Court with an incomplete picture of the business and financial relationships of petitioner and Crocus during the taxable periods at issue.  The problem has been aggravated by respondent's unexplained failure to follow through with discovery after the Court granted respondent's application for a letter of request authorizing a foreign deposition.

Against the background of the declaration in support of petitioner's motion for summary judgment "that dealing with quasi-government agencies in Russia is a sensitive mixture of politics, negotiation, and money," we follow the direction of paragraph 27 of the stipulation of facts to disregard any suspicions raised by the use of a tax haven jurisdiction as the locus for the royalty agreement to which petitioner became a party,[15] by the criminal investigation[16] and the invocation by petitioner's stockholders of their Fifth Amendment privilege,[17]

---

[15]The Republic of Ireland was regarded by respondent as a tax-haven jurisdiction during the taxable periods at issue.  See 1 Audit, Internal Revenue Manual (CCH), sec. 4233, Exhibit 500-8, at 9509.

[16]Cf. Capital Video Corp. v. Commissioner, 311 F.3d 458 (1st Cir. 2002), affg. T.C. Memo. 2002-40.

[17]Because of the invocation of the Fifth Amendment privilege by petitioner's stockholders, petitioner has not provided relevant information with respect to the business and financial relationships between petitioner, ECI, and Crocus.  An invocation of the Fifth Amendment is not a substitute for relevant evidence,
(continued...)

and by Crocus's status as a foreign entity whose financial records have not been made part of the record.[18]

We interpret the parties' stipulated instruction not to draw any adverse inference against either of them from the disregarded royalty agreement with ECI as a direction not to apply the rule of Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. on other grounds 162 F.2d 513 (10th Cir. 1947) against either of them, despite the lack of relevant record evidence they did not show was not within their power to produce. We further interpret the parties' stipulated instruction not to draw adverse inferences as being primarily for the protection of petitioner and as directed primarily to what might be otherwise justified suspicions generated by the existence and terms of the royalty agreement in the first place, not by the stipulation of

---

[17](...continued)
and a litigant claiming the privilege is not freed from adducing proof in support of a proposition on which he has the burden of proof. United States v. Rylander, 460 U.S. 752, 758 (1983); United States v. 4003-4005 5th Ave., 55 F.3d 78, 83 (2d Cir. 1995). Petitioner's failure to present sufficient evidence is not excused by the invocation of the Fifth Amendment privilege by its stockholders.

[18]This is another of those cases in which we "have sought to delineate a path through the thicket of problems which inhere in a situation where the liability of a U.S. taxpayer is related to information in the hands of a foreign entity and access to that information involves the attitude of that foreign entity and the application of the laws of a foreign country." Gerling Intl. Ins. Co. v. Commissioner, 98 T.C. 640, 646-648 (1992), on remand from 839 F.2d 131 (3d Cir. 1988), revg. and remanding 87 T.C. 679 (1986), supplementing 86 T.C. 468 (1986).

the parties to disregard the royalty agreement and ECI for the purposes of this case.

Issue 1.  Whether Petitioner and Crocus Were Engaged in a Joint Venture or Joint Ventures To Conduct Foreign Trade Shows During January 1, 1995 to July 31, 1996

Whether there is a partnership for tax purposes is a matter of Federal, not local, law.[19]  Commissioner v. Tower, 327 U.S. 280, 287-288, (1946); Estate of Kahn v. Commissioner, 499 F.2d 1186, 1188 (2d Cir. 1974), affg. Grober v. Commissioner, T.C. Memo. 1972-240; Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 849 (1957).  "[T]he term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate."  Secs. 761(a), 7701(a)(2).  The principles used to determine whether there is a partnership for Federal tax purposes are equally applicable to determine whether there is a joint venture for Federal tax purposes.  Sierra Club, Inc. v. Commissioner, 103 T.C. 307, 323 (1994), affd. in part and revd. in part on other grounds 86 F.3d 1526 (9th Cir. 1996); Luna v.

---

[19]Neither petitioner nor respondent has addressed whether petitioner and Crocus engaged in a partnership or joint venture under Russian law.  Because the record provides no information or evidence with respect to the subject of partnerships or joint ventures under Russian law, we apply U.S. tax law to determine whether petitioner and Crocus conducted foreign trade shows as a joint venture.

<u>Commissioner</u>, 42 T.C. 1067, 1077 (1964); <u>Beck Chem. Equip. Corp.</u> <u>v. Commissioner</u>, <u>supra</u> at 848-849.

The required inquiry for determining the existence of a partnership for Federal income tax purposes is whether the parties "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." <u>Commissioner v. Tower</u>, <u>supra</u> at 287. Their intention is a matter of fact, "to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" <u>Id.</u> at 287 (quoting <u>Drennen v. London Assurance Co.</u>, 113 U.S. 51, 56 (1885)).

In <u>Commissioner v. Culbertson</u>, 337 U.S. 733, 742 (1949), the Supreme Court elaborated on this standard and stated that there is a partnership for Federal tax purposes when

> considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. [Fn. ref. omitted.]

In <u>Luna v. Commissioner</u>, <u>supra</u> at 1077-1078, this Court distilled the principles mentioned in <u>Commissioner v. Tower</u>, <u>supra</u>, and <u>Commissioner v. Culbertson</u>, <u>supra</u>, to set forth the following factors as relevant in evaluating whether parties

intend to create a partnership for Federal income tax purposes (the Luna factors):

> the agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

See also Estate of Kahn v. Commissioner, supra at 1189.

None of the Luna factors is conclusive of the existence of a partnership. Burde v. Commissioner, 352 F.2d 995, 1002 (2d Cir. 1965), affg. 43 T.C. 252 (1964); McDougal v. Commissioner, 62 T.C. 720, 725 (1974). We apply each Luna factor to the stipulated facts of this case to determine whether petitioner and Crocus engaged in a joint venture to conduct foreign trade shows during the taxable periods at issue.

1. The Agreement of the Parties and Their Conduct in Executing Its Terms

Petitioner admits there was no written agreement between petitioner and Crocus to operate foreign trade shows as a joint venture. However, petitioner argues that the trade show

contracts and the cooperation agreement with Expocentr are written documents that evidence a joint venture.

The trade show contracts evidence contractual terms with respect to leasing pavilions owned by Expocentr. Under paragraph 9 of each of the trade show contracts, petitioner alone was obligated to pay rent and other fees for the use of the pavilions. The trade show contracts do not refer to any joint venture between any of the parties. Similarly, the cooperation agreement merely reflects a general understanding with Expocentr as to how future trade shows would be conducted in Expocentr pavilions; it says nothing about a joint venture between petitioner and Crocus.

Although the parties have agreed to disregard the royalty agreement for Federal income tax purposes, petitioner argues that the royalty agreement is a formal agreement to enter into a joint venture. However, the royalty agreement contains no provisions that refer to a business relationship between petitioner and Crocus or to any agreement that provides Crocus with a share of the profits. In form, the royalty agreement provides for a division of gross receipts between petitioner and ECI.

Petitioner argues that evidence of a joint venture agreement can be found in the stipulated fact that before January 1, 1995, no foreign trade shows were organized unless both petitioner and Crocus agreed to put on the trade show. However, this does not

prove the existence of an agreement to join in a joint venture to share profits or losses or both as required by <u>Commissioner v. Tower</u>, 327 U.S. 280 (1946).  Rather, it reflects a continuation of the prior understanding or course of dealing between petitioner and Crocus to have their resources available at specific times and places to conduct foreign trade shows.

The existence or lack of a written agreement is not determinative of whether a joint venture existed between petitioner and Crocus.  <u>Sierra Club v. Commissioner</u>, 103 T.C. at 324; <u>Cohen v. Commissioner</u>, 15 T.C. 261, 272 (1950) (The absence of an express agreement to share in losses is not material, since such an agreement may be implied from their agreement to share profits).  In <u>Beck Chem. Equip. Corp. v. Commissioner</u>, 27 T.C. 840 (1957), we found there was a joint venture on the basis of an oral agreement between the parties.

Even though petitioner claims there was an oral agreement between petitioner and Crocus to an equal split of net profits from foreign trade shows conducted from 1990 to 1996, petitioner has not introduced any documentary or testimonial evidence of the existence of any such alleged oral agreement.  Petitioner has provided no evidence to show that it and Crocus did in fact split net profits equally.

This <u>Luna</u> factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

2.  <u>The Contributions, If Any, Which Each Party Has Made to the Venture</u>

Petitioner and respondent agree that both petitioner and Crocus made significant contributions to foreign trade shows. This <u>Luna</u> factor supports the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

3.  <u>The Parties' Control Over Income and Capital and the Right of Each To Make Withdrawals</u>

Petitioner and Crocus did not have mutual or joint control over capital and income generated by foreign trade shows. During the taxable periods at issue, petitioner or ECI collected and controlled fees from exhibitors located outside the former Soviet Union, which accounted for 90 percent of all foreign trade show fees, and Crocus collected and controlled fees from exhibitors located in the former Soviet Union, which accounted for the remaining 10 percent of all foreign trade show fees. Nothing in the record indicates that Crocus had control over or a right to make withdrawals or to receive distributions or payments from the share of receipts collected by petitioner and ECI during the taxable periods at issue.  Crocus is only a party to the royalty agreement between petitioner, Crocus, and ECI with respect to an offset of a debt.  Nothing in the royalty agreement

or the parties' stipulation indicates that Crocus was entitled to receive a share of net profits from the 75 percent of gross receipts to be paid to ECI.[20]

Petitioner negotiated all contracts with exhibitors located outside the former Soviet Union, which accounted for 90 percent of fees collected for foreign trade shows. If an exhibitor were to cancel a contract with petitioner, petitioner would retain all payments received as liquidated damages.[21] Nothing in the record indicates Crocus was entitled to receive any potential liquidated damages retained by petitioner.

This Luna factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

4. Whether Each Party Was a Principal and Coproprietor, Sharing a Mutual Proprietary Interest in the Net Profits and Having an Obligation to Share Losses, or Whether One Party Was the Agent or Employee of the Other, Receiving For His Services Contingent Compensation in the Form of a Percentage of Income

There is no evidence petitioner and Crocus had an agreement to share or did in fact share in the net profits or losses of foreign trade shows. We infer from the stipulated facts

---

[20]However, the stipulation does indicate that ECI did in fact reimburse Crocus for its direct expenses during the taxable periods at issue.

[21]Neither Exhibit 7-J, a sample copy of a contract with an exhibitor, nor the royalty agreement indicate whether payments retained by petitioner as liquidated damages would be paid or remitted to ECI in accordance with ECI's right under Arts. 3.2 and 4.1 of the royalty agreement to receive 75 percent of the gross receipts from foreign trade shows.

regarding the total gross revenues from foreign trade shows during the periods at issue and the 10 percent thereof received by Crocus from exhibitors located in the former Soviet Union that Crocus retained fees collected from such exhibitors as compensation for its services in operating the foreign trade shows.

The owner of a business may agree to compensate a hired manager or key employee with a percentage of the income of the business, or a broker may be retained to sell property for a commission based on the net or gross sales price. Even though both arrangements may culminate in a division of profits, neither constitutes a partnership unless the arrangement results in the parties' becoming coproprietors.

In Luna v. Commissioner, 42 T.C. 1067 (1964), we held there was no partnership where the taxpayer was to receive a percentage of the renewal commissions from an insurance policy he had designed in exchange for his management services to the insurance company. In so holding, we focused on the following: That neither the taxpayer nor the insurance company in any way indicated, prior to the suit, an intent to join together as partners; partnership tax returns were not filed, and neither party held itself out to others as a joint venturer with the other party; the taxpayer was not authorized to engage in the insurance business except as an agent selling insurance policies;

and the taxpayer and the insurance company would not and did not share in any losses resulting from the sale of the new type of policy.

Disregarding ECI and the royalty agreement, petitioner is the only party with a proprietary interest in the profit-producing activity of promoting and operating the foreign trade shows during the periods at issue. Crocus's retention of fees collected from exhibitors located in the former Soviet Union does not, by itself, result in a joint venture. It may fairly be inferred from the stipulated record that Crocus was reimbursed for its direct expenses only, not its overhead expenses. See supra pp. 25-26. Although Crocus was subject to the risk of loss of its unreimbursed overhead expenses, Crocus's risk of loss is trivial as compared with petitioner's risk of loss arising from its liability for the substantial Expocentr rent obligations in addition to its own direct expenses. The facts as a whole suggest Crocus was not a coproprietor because it did not share in possible losses of substantial Expocentr rent obligations or petitioner's direct expenses, did not negotiate the trade show contracts or cooperation agreement with Expocentr and contracts with exhibitors located outside the former Soviet Union, and did not own any rights to foreign trade show profits.

This Luna factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

5. Whether Business Was Conducted in the Joint Names of the Parties

The evidence with respect to this Luna factor is mixed. One trade catalogue listed both petitioner and Crocus as the producers and managers of the trade show; another catalogue listed petitioner as the producer and manager of the trade show and listed Crocus as the marketer of the trade show in the former Soviet Union. Advertisements in English direct exhibitors to contact petitioner for information on exhibiting in future trade shows. The trade show catalogues contain letters from officers of both petitioner and Crocus thanking exhibitors for attending the trade shows. Overall, trade show catalogues do not conclusively suggest to third parties that business was conducted in the joint names of Comtek and Crocus.

Both petitioner and Crocus signed the trade show contracts and cooperation agreement with Expocentr. However, under the three trade show contracts in evidence, petitioner alone was obligated to pay rent and other fees for the use of the pavilions. Crocus is involved in none of the proposals for future cooperation between petitioner and Expocentr. These contracts suggest that petitioner was the principal party in negotiations with Expocentr.

This Luna factor is neutral with respect to whether petitioner and Crocus engaged in a joint venture during the taxable periods at issue.

6. <u>Whether the Parties Filed Federal Partnership Returns or Otherwise Represented to Respondent or to Persons With Whom They Dealt That They Were Joint Venturers</u>

Under section 6031 and section 1.6031-1(c) and (d), Income Tax Regs., every partnership engaged in trade or business, or having income from sources within the United States was required to file a partnership return.  Petitioner and Crocus did not file partnership returns for the taxable periods at issue.  It is not clear from the record whether petitioner and Crocus conducted foreign trade shows as a joint venture engaged in trade or business, or having income from sources, within the United States.  The purpose of this <u>Luna</u> factor is to determine whether petitioner and Crocus represented to respondent that they conducted foreign trade shows as a joint venture.  In deciding this issue, it is not necessary to determine whether petitioner and Crocus were required to file a partnership return under section 6031 and section 1.6031-1(c) and (d), Income Tax Regs.

Regardless of whether petitioner and Crocus were required to file a partnership return, neither petitioner nor Crocus represented to respondent that they conducted foreign trade shows during the taxable periods at issue as a joint venture.  On its returns for the taxable periods at issue, petitioner did not explain or state that it was engaged in a partnership with any entity; petitioner merely reported its share of gross income from foreign trade shows in accordance with the royalty agreement. There is no other evidence or document in the record that

suggests petitioner or Crocus represented to respondent that they conducted foreign trade shows as a joint venture.

The evidence indicates that petitioner represented to the great majority of exhibitors that it conducted foreign trade shows independently with no partner. Petitioner itself negotiated and entered into all contracts with exhibitors located outside the former Soviet Union, which accounted for 90 percent of trade show fees. If an exhibitor were to cancel a contract with petitioner, petitioner was entitled to retain all payments received as liquidated damages. Nothing in the record indicates Crocus was entitled to receive any potential liquidated damages retained by petitioner. At all foreign trade shows, petitioner's employees solicited exhibitors for future shows and provided liaison between exhibitors and Crocus's employees, thus indicating to the exhibitors that petitioner was in charge of the foreign trade shows.

Even though both petitioner and Crocus were parties to the cooperation agreement and trade show contracts with Expocentr, petitioner alone was obligated to pay rent and other fees for the use of the pavilions, and petitioner was the principal party in negotiations with Expocentr for the future use of pavilions. These contracts suggest that petitioner and Crocus did not represent themselves as a partnership or as joint venturers to Expocentr.

This <u>Luna</u> factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

7. <u>Whether Separate Books of Account Were Maintained for the Venture</u>

There is no evidence that separate books of account were maintained for a joint venture between petitioner and Crocus. Receipts, expenses, and other items with respect to foreign trade shows during the taxable periods at issue are recorded in petitioner's trial balances. However, the trial balances provide no indication that profits or losses were split between petitioner and Crocus. The record contains no corresponding trial balances for Crocus.

This <u>Luna</u> factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

8. <u>Whether the Parties Exercised Mutual Control Over and Assumed Mutual Responsibilities for the Enterprise</u>

Each party was responsible for paying its trade show expenses. Crocus was reimbursed for all its direct expenses by ECI. While both parties assumed mutual responsibilities for conducting the trade shows, there is no evidence Crocus had any control over the 90 percent of trade show receipts collected by petitioner and ECI. Under the contracts with Expocentr, petitioner was solely responsible for payments of rent for leasing pavilions. If an exhibitor located outside the former

Soviet Union canceled a contract, petitioner alone could retain liquidated damages.

This <u>Luna</u> factor weighs against the finding of a joint venture between petitioner and Crocus during the taxable periods at issue.

Six of the eight <u>Luna</u> factors weigh against the finding of a joint venture; one <u>Luna</u> factor is neutral; and one <u>Luna</u> factor supports the finding of joint venture.  Applying the various <u>Luna</u> factors, with no one factor being conclusive, we hold there was no joint venture between petitioner and Crocus to operate foreign trade shows during the taxable periods at issue.

We reach the same result using an overall or "gestalt" approach.  Whether a joint venture exists depends ultimately on the intent of the parties.  <u>Commissioner v. Culbertson</u>, 337 U.S. 733 (1949); <u>Commissioner v. Tower</u>, 327 U.S. 280 (1946).  The trier of fact is to ascertain the parties' intent by "considering all the facts--the agreement, the conduct of the parties in execution of its provisions * * * and any other facts throwing light on their true intent".  <u>Commissioner v. Culbertson</u>, <u>supra</u> at 742;  <u>Burde v. Commissioner</u>, 352 F.2d at 1002.

Considering all the facts and circumstances of this case that the parties have seen fit to reveal, we find that petitioner and Crocus did not intend to join together in the conduct of a joint venture or ventures to share profits or losses.  Crocus was reimbursed for its trade show expenses by ECI; there is no

evidence Crocus shared in the 25 percent of gross receipts allocated to and reported by petitioner under the royalty agreement. It was petitioner who conducted the trade show business in the United States, Russia, and elsewhere in Europe. Crocus's role was limited to assisting with the logistics of setting up and conducting the trade shows in the former Soviet Union and obtaining a few Russian exhibitors for those shows.

Although the "parties agree that no adverse inference should be drawn against either of them based on the ECI [royalty] agreement," the parties have neither filled nor illuminated the "black hole" that results from their removal of the royalty agreement and ECI from the picture. The removal of the royalty agreement and ECI does not uncover a subsisting joint venture or series of joint ventures between petitioner and Crocus.

We hold there was no joint venture between petitioner and Crocus to operate foreign trade shows during the taxable periods at issue.

Issue 2. In the Alternative, Whether and in What Amounts Petitioner Is Entitled to Additional Business Expense Deductions for the Taxable Periods at Issue, for Amounts Paid or Payable to Crocus as Compensation for Its Services in Operating the Foreign Trade Shows

Petitioner argues in the alternative that we should find that Crocus was entitled to a markup on its direct expenses as compensation for its services in operating the foreign trade shows. Petitioner claims a compensation deduction under section 162(a)(1) for amounts paid or payable to Crocus as a markup.

Petitioner argues that we should estimate a markup paid or payable to Crocus as compensation for its services equivalent to 50 percent of the net profits for foreign trade shows held during the taxable periods at issue. Specifically, petitioner asks us to allocate Crocus a markup of $2,135,614.50 (50 percent of $4,271,229 net profit) for foreign trade shows conducted during the last 7 months of the fiscal year ended July 31, 1995, and $3,058,173 (50 percent of $6,116,346 net profit) for foreign trade shows conducted during the fiscal year ended July 31, 1996.

Respondent asks us to disregard the corporate entities of petitioner and Crocus. Respondent views their transactions at the stockholder level, in accordance with Article 10 of the stockholders' agreement, under which petitioner's net profits of foreign trade shows are to be allocated 50 percent to Agalarov, and the other 50 percent split between Pollak, Tseytin, and Kogan. Respondent argues that petitioner should not be allowed a markup to Crocus because Crocus was the alter ego of Agalarov who should receive his share of 50 percent of the net profits under the stockholders' agreement. Specifically, respondent asks us to allocate all gross receipts and expenses to petitioner, which would leave it with net profit of $4,271,229 for the last 7 months of the fiscal year ended July 31, 1995, and net profit of $6,116,346 for the fiscal year ended July 31, 1996. In respondent's view, Agalarov would then be allocated 50 percent of the net profits to be paid to him as a dividend, with the

remaining profits allocated to and retained on behalf of the other three stockholders.

Petitioner argues that the stockholders' agreement was superseded by the royalty agreement. Respondent argues that the stockholders' agreement continues in effect and determines the split of net profits.

We reject both petitioner's and respondent's arguments. We reject respondent's argument because a corporate entity generally will not be disregarded for tax purposes so long as it is formed for a substantial business purpose or actually engages in a business activity after its formation. Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943); O'Neill v. Commissioner, 170 F.2d 596, 598 (2d Cir. 1948), affg. a Memorandum Opinion of this Court dated Aug. 8, 1947; Recklitis v. Commissioner, 91 T.C. 874, 892 (1988). On the other hand, when a corporation is not formed for any significant, nontax business purpose, and does not engage in any substantive business activity, its existence will be disregarded for tax purposes, even though it may be validly incorporated under State law. Recklitis v. Commissioner, supra; Noonan v. Commissioner, 52 T.C. 907, 910 (1969), affd. 451 F.2d 992 (9th Cir. 1971). In Natl. Carbide Corp. v. Commissioner, 336 U.S. 422, 433 (1949), the Supreme Court refused to disregard the existence of a corporation even though it stated: "Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day

activities are determined not as decisions of the corporation but by their owners acting individually."

There is no evidence, nor has respondent directly argued, that the separate entity status of petitioner or Crocus should be disregarded. The stockholders' agreement is simply an agreement between stockholders to split petitioner's net profits in percentages that vary from the stockholders' stock ownership percentages. We reject petitioner's argument that the stockholders' agreement is superseded by the royalty agreement because there is no evidence that the stockholders have ever rescinded the stockholders' agreement or declared it invalid. Although we agree with respondent that the stockholders' agreement is still valid and in effect, it does not prove that petitioner or Crocus acted in such a way that their separate corporate status should be disregarded. Petitioner and Crocus were formed for substantial nontax business purposes and engaged in business activities, including conducting and providing services for trade shows. Petitioner, not its stockholders, conducted trade shows in the United States and the former Soviet Union. Crocus, not Agalarov, performed services in helping petitioner put on foreign trade shows. Third parties, including Expocentr and exhibitors, transacted business with petitioner and Crocus, not their stockholders. Petitioner never declared or paid dividends to any of its stockholders, and there is no

evidence petitioner distributed profits under the stockholders' agreement to Agalarov or the other stockholders.

We see no evidence that petitioner and Crocus were formed for purely tax avoidance purposes. Petitioner's stockholders subjected themselves to two layers of U.S. income tax by forming petitioner as a separate corporate entity to conduct trade shows. It would not have been efficient, in the tax or economic sense, for petitioner to pay Agalarov for his services by declaring a dividend or making a distribution subject to double taxation. Rather, petitioner could receive a deduction from gross revenues either by paying Agalarov directly as an employee or by paying Crocus directly. Inasmuch as Crocus is a separate entity from petitioner, it is highly unlikely that Crocus would have performed services at foreign trade shows for nothing more than the reimbursement of its direct expenses. Although the disclosed arrangements between petitioner and Crocus are opaque, we see nothing in them that would justify the stretch respondent asks the Court to indulge in. We see no reason to disregard the separate corporate status of petitioner or Crocus.

Petitioner argues that Crocus should be allocated at least 50 percent of net profits reported in the stipulation of facts because Crocus paid more than 50 percent of the total foreign trade show expenses paid by petitioner and Crocus.[22] Also,

_____

[22]Petitioner's argument disregards Expocentr rent payments,
(continued...)

according to Bortzov, Crocus was dissatisfied with the pre-January 1, 1995, business arrangement.

There is no evidence Crocus received, had any control over, or had rights to make withdrawals from the 90 percent of trade show receipts collected by petitioner and ECI. Petitioner's argument is undermined by the fact that Crocus did not bear the burden of its direct expenses because those expenses were reimbursed. Petitioner provided no information about the financial records of Crocus and ECI to substantiate its argument for a greater deduction or higher allocation of net profits to Crocus as a compensation deduction. We therefore reject petitioner's request to allocate to Crocus 50 percent or more of the net profits reported in the stipulation of facts.[23]

---

[22](...continued)
which are allocable to petitioner. If Expocentr rent payments are included in the total expenses for foreign trade shows, Crocus's share of such expenses is less than 38 percent for the last 7 months of the fiscal year ended July 31, 1995, and less than 27 percent for the fiscal year ended July 31, 1996.

[23]We shall not accede to petitioner's request that we use sec. 482 to allocate income between petitioner and Crocus because we find that petitioner and Crocus were not controlled or owned by the same interests as required for the application of sec. 482. Control for sec. 482 purposes includes "any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised * * *." It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted." Sec. 1.482-1(i)(4), Income Tax Regs.; see also B. Forman Co. v. Commissioner, 453 F.2d 1144, 1152-1153 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912 (1970). Although Agalarov owned 100 percent of Crocus, he owned only 33.33 percent of petitioner. Agalarov did
(continued...)

Section 162(a)(1) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.

Petitioner has presented no financial records of the business operations of ECI and Crocus. The incompleteness of the record has been aggravated by respondent's unexplained failure to follow through with discovery after the Court granted respondent's application for a letter of request authorizing a foreign deposition. The stipulated facts in this case present a mysterious world where real-life agreements are disregarded, financial records are nowhere to be found, and a myriad of other relevant information is absent. Although both petitioner and respondent have agreed that disregarding the royalty agreement and ECI should not have an adverse effect on either party, the "black hole" surrounding the financial operations of ECI and Crocus has impaired our ability to understand the business and financial relationships of petitioner and Crocus.

---

[23](...continued)
not control the vote of petitioner's Board of Directors because he was one of three directors. There is no evidence in the record that Agalarov controlled petitioner's business decisions. Thus, we do not find that petitioner and Crocus were owned or controlled by the same interests for purposes of applying sec. 482.

In the stipulation of facts, "the parties agree that the Court may characterize the relationship between petitioner and Crocus vis-a-vis foreign trade shows based solely on this Stipulation of Facts and the Exhibits attached hereto and the opposing party's admissions filed in this case." The stipulated record provides substantial evidence that Crocus performed significant and substantial services in operating the foreign trade shows. Inasmuch as Crocus is a separate entity from petitioner, it is highly unlikely that Crocus would have performed services at foreign trade shows for nothing more than the reimbursement of its direct expenses. We are mindful of the admonition of Judge Learned Hand in Commissioner v. Maresi, 156 F.2d 929, 931 (2d Cir. 1946), affg. 6 T.C. 582 (1946), that "The one sure way to do injustice in such cases is to allow nothing whatever upon the excuse that we cannot tell how much to allow." See also Gerling Intl. Ins. Co. v. Commissioner, 98 T.C. 640, 659 (1992). Doing the best we can with the gap-riddled record the parties have created, we find that fees collected by Crocus during the taxable periods at issue from exhibitors located in the former Soviet Union were retained by Crocus as compensation for its services in operating the foreign trade shows. Inasmuch as it may fairly be inferred and we do find that such fees have been included in petitioner's gross income under the stipulation

of the parties, petitioner is entitled to deduct the amount of such fees from its gross income under section 162(a)(1).[24]

There is no evidence to suggest that ECI's reimbursements to Crocus were reduced by the fees collected by Crocus. There is no evidence to suggest Crocus remitted such fees to either ECI or petitioner.

We find that fees collected by Crocus during the taxable periods at issue from exhibitors located in the former Soviet Union were retained by Crocus. We also find that fees collected and retained by Crocus from exhibitors domiciled in the former Soviet Union were available to pay Crocus's overhead expenses with respect to foreign trade shows.

Unlike the inherently vague stipulation of facts for pre-January 1, 1995, foreign trade shows, petitioner and respondent stipulated "the total gross revenues from exhibition fees for foreign trade shows" conducted during the taxable periods at issue to be included in petitioner's gross income. It may fairly be inferred from the stipulation that "total gross revenues from exhibition fees for foreign trade shows" includes fees collected

---

[24]We reject petitioner's argument that the Court should allocate Crocus a markup on its direct expenses as compensation for its services and that such markup should be estimated under the Cohan rule (Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930)). We shall not attempt to estimate Crocus's compensation under the Cohan rule because the stipulated record provides enough information to calculate the exact amount of fees collected by Crocus from exhibitors located in the former Soviet Union and retained by Crocus as compensation for its services in operating the foreign trade shows.

and retained by Crocus from exhibitors located in the former Soviet Union.

Our conclusion is consistent with and confirmed by the notion that Crocus would also be entitled to compensation for operating the foreign trade shows under common law principles of agency and quantum meruit. Section 441 of the Restatement (Second), Agency (1958) states:

> Unless the relation of the parties, the triviality of the services, or other circumstances, indicate that the parties have agreed otherwise, it is inferred that a person promises to pay for services which he requests or permits another to perform for him as his agent.

A plaintiff may recover "in quantum meruit 'to assure a just and equitable result,' * * * where 'the defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them'". Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (quoting Bradkin v. Leverton, 26 N.Y.2d 192, 196 (1970); see also Restatement, Restitution, sec. 112 (1937)).

Petitioner requested and received Crocus's services in helping petitioner conduct foreign trade shows. Respondent acknowledges Crocus's services were substantial and significant. Because Crocus's sole owner, Agalarov, owns only a 33.33-percent minority interest in petitioner, petitioner and Crocus are not sufficiently related to assume Crocus would provide its services to petitioner for nothing more than the reimbursement of its direct expenses, and there is no evidence to suggest otherwise.

It may fairly be inferred from the stipulated record that petitioner requested Crocus's services because Crocus had the expertise and support staff necessary to conduct trade shows in the former Soviet Union.  The services provided by Crocus were necessary to operate the foreign trade shows.  Crocus was also responsible for relations with exhibitors located in the former Soviet Union, including collecting fees from such exhibitors.  It may fairly be inferred that one purpose of the foreign trade shows was to increase mutual contacts and provide networking opportunities for exhibitors located outside the former Soviet Union to establish business relationships with companies in the former Soviet Union.  Although fees collected from exhibitors located in the former Soviet Union accounted for only 10 percent of all trade show receipts, the attendance of such exhibitors at foreign trade shows no doubt increased networking opportunities for exhibitors located outside the former Soviet Union, thereby making the trade shows more attractive to them.

Because services provided by Crocus were essential to conduct and increase the profitability of the foreign trade shows, it may fairly be inferred that petitioner or ECI made arrangements for Crocus to receive some payment for its services in addition to the reimbursement of its direct expenses of operating the foreign trade shows.[25]

---

[25]It might be objected that Crocus's right to compensation
(continued...)

Crocus's compensation consisted of a portion of the gross revenues from foreign trade shows, which was contingent on the amount of fees Crocus collected from exhibitors located in the former Soviet Union.  For foreign trade shows conducted during the last 7 months of the fiscal year ended July 31, 1995, Crocus's compensation of 10 percent of gross revenues amounted to $1,307,122 (10 percent of gross revenues of $13,071,216).  For foreign trade shows conducted during the fiscal year ended July 31, 1996, Crocus's compensation of 10 percent of gross revenues amounted to $2,068,759 (10 percent of gross revenues of $20,687,586).  Petitioner is entitled to deduct the amount of such fees collected by Crocus during the taxable periods at issue from exhibitors located in the former Soviet Union as reasonable compensation to Crocus for its services in operating the foreign trade shows.

---

[25](...continued)
would have to be established under the laws of the place of performance, in this case Russia.  See Restatement (Second), Conflict of Laws, sec. 221 (1971).  The issue in this case is not whether Crocus has a right to recover payments of compensation from petitioner under theories of agency or restitution.  Rather, we must decide whether petitioner or ECI paid Crocus for its services from net profits of foreign trade shows.  The laws of Russia or other foreign countries with respect to notions of agency or restitution are not relevant in deciding whether petitioner or ECI had a compensation arrangement with Crocus.  Our discussion of Crocus's rights to compensation under common-law principles of agency and restitution is simply meant to refute respondent's argument that Crocus worked on foreign trade shows for nothing more than the reimbursement of its direct expenses with no understanding that it would be entitled to a markup to be applied to its overhead and the possibility of making a profit.

The result of our holdings is that petitioner is entitled to deduct 30.6 percent and 33.8 percent, respectively, of the stipulated net profits of the foreign trade shows for the 7 months ended July 31, 1995, and the fiscal year ended July 31, 1996, as compensation to Crocus.

In summary, we hold that petitioner and Crocus were not engaged in a joint venture during the taxable periods at issue; petitioner must therefore report all revenues from foreign trade shows collected by petitioner or ECI during the taxable periods at issue. Petitioner may deduct its direct expenses, the Expocentr rent expenses, and Crocus's reimbursed direct expenses, all in accordance with the stipulation of the parties. Petitioner is also entitled to deduct the amount of fees collected by Crocus during the taxable periods at issue from exhibitors located in the former Soviet Union as reasonable compensation to Crocus for its services in operating the foreign trade shows.

To give effect to the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>