F. C. AND FRANKIE MCDOUGAL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GILBERT AND JACKIE MCCLANAHAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 534–72, 535–72.    Filed August 29, 1974.

*Towner Leeper* and *Jesus Samaniego*, for the petitioners.
*James N. Mullen*, for the respondent.

FAY, *Judge:* The respondent has determined the following deficiencies in, and additions to, the income tax of the petitioners:

| Petitioners | Year | Deficiency | Addition to tax section 6653(b), I.R.C. 1954 |
|---|---|---|---|
| F. C. and Frankie McDougal | 1968 | $117 | |
| | 1969 | 6,758 | |
| Gilbert and Jackie McClanahan | 1968 | 659 | $278 |
| | 1969 | 430 | 22 |

The petitioners have in turn claimed income tax refunds for the aforesaid years.

Mutual concessions having been made, the following issues remain to be decided:

(1) Did the McDougals' transfer of a one-half interest in the racehorse, Iron Card, to Gilbert McClanahan constitute a gift, or alternatively, did the aforesaid transfer constitute a contribution to an oral partnership or joint venture previously or contemporaneously formed by the McDougals and Gilbert McClanahan; and

(2) Did the McClanahans fail to report $500 of income in the year 1969.

## FINDINGS OF FACT

Certain facts have been stipulated by the parties and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

F. C. and Frankie McDougal are husband and wife, as are Gilbert and Jackie McClanahan. Each couple filed joint Federal income tax returns for the years 1968 and 1969 with the district director of internal revenue in Austin, Tex. Petitioners were all residents of Berino, N. Mex., when they filed their petitions with this Court.

F. C. and Frankie McDougal [1] maintained farms at Lamesa, Tex., where they were engaged in the business of breeding and racing horses. Gilbert McClanahan [2] was a licensed public horse trainer who rendered his services to various horse owners for a standard fee. He had numbered the McDougals among his clientele since 1965.

On February 21, 1965, a horse of exceptional pedigree, Iron Card, had been foaled at the Anthony Ranch in Florida. Title to Iron Card was acquired in January of 1967 by one Frank Ratliff, Jr., who in turn transferred title to himself, M. H. Ratliff, and John V. Burnett (Burnett). The Ratliffs and Burnett entered Iron Card in several races as a 2-year-old; and although the horse enjoyed some success in these contests, it soon became evident that he was suffering from a condition diagnosed by a veterinarian as a protein allergy.

When, due to a dispute among themselves, the Ratliffs and Burnett decided to sell Iron Card for whatever price he could attract, McClanahan (who had trained the horse for the Ratliffs and Burnett) advised the McDougals to make the purchase. He made this recommendation because, despite the veterinarian's prognosis to the contrary, McClanahan believed that by the use of home remedy Iron Card could be restored to full racing vigor. Furthermore, McClanahan felt that as Iron Card's allergy was not genetic and as his pedigree was impressive, he would be valuable in the future as a stud even if further attempts to race him proved unsuccessful.

The McDougals purchased Iron Card for $10,000 on January 1, 1968. At the time of the purchase McDougal promised that if McClanahan trained and attended to Iron Card, a half interest in the horse would be his once the McDougals had recovered the costs and expenses of acquisition. This promise was not made in lieu of payment of the standard trainer's fee; for from January 1, 1968, until the date of the transfer, McClanahan was paid $2,910 as compensation for services rendered as Iron Card's trainer.

---

[1] Henceforth "McDougal" is used with reference to F. C. McDougal alone.
[2] Henceforth "McClanahan" is used with reference to Gilbert McClanahan alone.

McClanahan's home remedy proved so effective in relieving Iron Card of his allergy that the horse began to race with success, and his reputation consequently grew to such proportion that he attracted a succession of offers to purchase, one of which reached $60,000. The McDougals decided, however, to keep the horse and by October 4, 1968, had recovered out of their winnings the costs of acquiring him. It was therefore on that date that they transferred a half interest in the horse to McClanahan in accordance with the promise which Mc-Dougal had made to the trainer. A document entitled "Bill of Sale," wherein the tranfer was described as a gift, was executed on the following day.

Iron Card continued to race well until very late in 1968 when, without warning and for an unascertained cause, he developed a condition called "hot ankle" which effectively terminated his racing career. From 1970 onward he was used exclusively for breeding purposes. That his value as a stud was no less than his value as a racehorse is attested to by the fact that in September of 1970 petitioners were offered $75,000 for him; but after considering the offer, the McDougals and McClanahan decided to refuse it, preferring to exploit Iron Card's earning potential as a stud to their own profit.[3]

On November 1, 1968, petitioners had concluded a partnership agreement by parol to effectuate their design of racing the horse for as long as that proved feasible and of offering him out as a stud thereafter. Profits were to be shared equally by the McDougals and the Mc-Clanahans, while losses were to be allocated to the McDougals alone.[4]

Though the partnership initially filed no return for its first brief taxable year ended December 31, 1968, petitioners did make the computations which such a return would show and reported the results in their individual returns. The partnership was considered to have earned $1,314, against which was deducted depreciation in the amount of $278. Other deductions left the partnership with taxable income for the year of $737, which was allocated to the extent of $405 to the McDougals and to the extent of $332 to the McClanahans.[5]

On their joint return for the year 1968 the McDougals reported, inter alia, gross income of $22,891 from their Lamesa farms. Against this income they deducted $1,390 representing depreciation on Iron Card for the first 10 months of 1968 and $9,213 in training fees.[6] The Mc-

---

[3] From 1970 to 1972 Iron Card was in fact to earn $36,750 in stud fees for his owners, with another $15,000 in fees being estimated for 1973 alone.

[4] The oral agreement was reduced to writing in April of 1970. We note that in their initial returns for 1968 petitioners failed to share the partnership's profits equally, but this was rectified in their amended returns for that year.

[5] The reason for this unequal division is unexplained. See fn. 4 above.

[6] Presumably this included $3,175 paid to McClanahan both before and after the transfer of Oct. 4, 1968, as compensation for the training of Iron Card.

Dougals appear, however, to have initially claimed no deduction by reason of the transfer to McClanahan of the half interest in Iron Card.

In addition to their distributive share of partnership income referred to above, the McClanahans reported $5,000 of gross income which they identified as a gift interest in a racehorse.

We shall now turn our attention to those returns and amended returns filed in April of 1970. The McDougals explicitly claimed by way of amendment to have transferred the half interest in Iron Card to McClanahan as compensation for services rendered and thus to be entitled to a $30,000 business expense deduction, computed by reference to the last offer to purchase Iron Card received prior to October 4, 1968. Furthermore, the McDougals acknowledged that they had recognized a gain on the aforesaid transfer. By charging the entire depreciation deduction of $1,390 against the portion of their unadjusted cost basis allocable to the half interest in Iron Card which they retained, the McDougals computed this gain to be $25,000 and characterized it as a long-term capital gain under section 1231(a) of the Internal Revenue Code of 1954.[7]

The McClanahans simultaneously increased their income arising out of the transfer from $5,000 to $30,000. They could thus claim to have a tax cost basis of $30,000 in their half interest in the horse. Finally, purporting to have transferred the horse to a partnership in concert on November 1, 1968, petitioners computed the partnership's basis in the horse to be $33,610 under section 723.[8] This increase in basis led the partnership to claim a depreciation deduction of $934 for 1968 instead of $278 and to report only $81 of taxable income for that year. The McDougals thereupon reduced their distributive share of partnership income for 1968 from $405 to $40, while the McClanahans reduced their share from $332 to $41.[9] For the year 1969 the partnership claimed a deduction for depreciation on Iron Card in the amount of $5,602, closing the year with a loss of $8,911. This loss was allocated in its entirety to the McDougals, pursuant to the partnership agreement.

On May 12, 1969, a deposit of $500 was made to an account which had previously been opened under the name of G. W. McClanahan with

---

[7] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[8] Having charged the entire amount of the depreciation which they had claimed ($1,390) against their unadjusted cost basis of $5,000 in the half interest in Iron Card which they retained, the McDougals considered themselves to have an adjusted basis of $3,610 in that retained half. The McClanahans claimed a $30,000 tax cost basis in the half interest which they had just received. Under sec. 723 the contribution of the two halves to a partnership would therefore result in the partnership's having a basis of $33,610 in Iron Card.

[9] See fn. 4 above.

the Ruidoso State Bank (Ruidoso). The McClanahans failed to include this amount in their gross income for 1969.

The transfer of October 4, 1968, gave rise to a joint venture to which the McDougals are deemed to have contributed Iron Card and in which they are deemed to have granted McClanahan an interest in the capital and profits thereof, equal to their own, as compensation for his having trained Iron Card.

The McClanahans failed to report $500 of income for the year 1969.

OPINION

Respondent contends that the McDougals did not recognize a $25,000 gain on the transaction of October 4, 1968, and that they were not entitled to claim a $30,000 business expense deduction by reason thereof. He further contends that were Iron Card to be contributed to a partnership or joint venture under the circumstances obtaining in the instant case, its basis in Iron Card at the time of contribution would have been limited by the McDougals' cost basis in the horse, as adjusted. Respondent justifies these contentions by arguing that the transfer of October 4, 1968, constituted a gift.

In the alternative, respondent has urged us to find that at some point in time no later than the transfer of October 4, 1968, McDougal and McClanahan entered into a partnership or joint venture [10] to which the McDougals contributed Iron Card and McClanahan contributed services. Respondent contends that such a finding would require our holding that the McDougals did not recognize a gain on the transfer of October 4, 1968, by reason of section 721, and that under section 723 the joint venture's basis in Iron Card at the time of the contribution was equal to the McDougals' adjusted basis in the horse as of that time.

We dismiss at the outset respondent's contention that the transfer of October 4, 1968, constituted a gift, and we are undeterred in so doing by the fact that petitioners originally characterized the transfer as a gift, *Bogardus* v. *Commissioner*, 302 U.S. 34 (1937). A gift has been defined as a transfer motivated by detached and disinterested generosity, *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960). The presence of such motivation is belied in this instance by two factors. The relationship of the parties concerned was essentially of a business nature, and the transfer itself was made conditional upon the outcome of an enter-

---

[10] By reason of sec. 761(a) joint ventures and partnerships have an identical effect on the determination of income tax liability.

prise which McDougal had undertaken at McClanahan's suggestion and in reliance upon McClanahan's ability to render it profitable. These factors instead bespeak the presence of an arm's-length transaction.

With respect to respondent's alternative contention, we note firstly that the law provides no rule easy of application for making a determination as to whether a partnership or joint venture has been formed but rather directs our attention to a congeries of factors relevant to the issue, of which none is conclusive, *Hubert M. Luna*, 42 T.C. 1067 (1964).

A joint venture is deemed to arise when two or more persons agree, expressly or impliedly, to enter actively upon a specific business enterprise, the purpose of which is the pursuit of profit; the ownership of whose productive assets and of the profits generated by them is shared; the parties to which all bear the burden of any loss; and the management of which is not confined to a single participant, *Estate of Kahn* v. *Commissioner*, 499 F. 2d 1186 (C.A. 2, 1974), affirming a Memorandum Opinion of this Court; *Sugg* v. *Hopkins*, 11 F. 2d 517 (C.A. 5, 1926); *Claire Giannini Hoffman*, 2 T.C. 1160 (1943); *Estate of L. O. Koen*, 14 T.C. 1406 (1950); *J. Roland Brady*, 25 T.C. 682 (1955).[11]

While in the case at bar the risk of loss was to be borne by the McDougals alone, all the other elements of a joint venture were present once the transfer of October 4, 1968, had been effected. Accordingly, we hold that the aforesaid transfer constituted the formation of a joint venture to which the McDougals contributed capital in the form of the horse, Iron Card, and in which they granted McClanahan an interest equal to their own in capital and profits as compensation for his having trained Iron Card. We further hold that the agreement formally entered into on November 1, 1968, and reduced to writing in April of 1970, constituted a continuation of the original joint venture under section 708(b)(2)(A). Furthermore, that McClanahan continued to receive a fee for serving as Iron Card's trainer after October 4, 1968, in no way militates against the soundness of this holding. See sec. 707(c), and sec. 1.707–1(c), example 1, Income Tax Regs. However, this holding does not result in the tax consequences which respondent has contended would follow from it. See sec. 1.721–1(b)(1), Income Tax Regs.

When on the formation of a joint venture a party contributing appreciated assets satisfies an obligation by granting his obligee a capital interest in the venture, he is deemed first to have transferred to the obligee an undivided interest in the assets contributed, equal in value to the amount of the obligation so satisfied. He and the obligee are deemed thereafter and in concert to have contributed those assets to the joint venture.

[11] See also *Lulu L. Powell*, T.C. Memo. 1967–32.

The contributing obligor will recognize gain on the transaction to the extent that the value of the undivided interest which he is deemed to have transferred exceeds his basis therein. The obligee is considered to have realized an amount equal to the fair market value of the interest which he receives in the venture and will recognize income depending upon the character of the obligation satisfied.[12] The joint venture's basis in the assets will be determined under section 723 in accordance with the foregoing assumptions. Accordingly, we hold that the transaction under consideration constituted an exchange in which the McDougals realized $30,000, *United States* v. *Davis*, 370 U.S. 65 (1962) ; *Kenan* v. *Commissioner*, 114 F. 2d 217 (C.A. 2, 1940), affirming 40 B.T.A. 824 (1939).

In determining the basis offset to which the McDougals are entitled with respect to the transfer of October 4, 1968, we note the following: that the McDougals had an unadjusted cost basis in Iron Card of $10,000; that they had claimed $1,390 in depreciation on the entire horse for the period January 1 to October 31, 1968; and that after an agreement of partnership was concluded on November 1, 1968, depreciation on Iron Card was deducted by the partnership exclusively.

Section 704(c) allows partners and joint venturers some freedom in determining who is to claim the deductions for depreciation on contributed property. As is permissible under the statute, petitioners clearly intended the depreciation to be claimed by the common enterprise once it had come into existence, an event which they considered to have occurred on November 1, 1968. Consistent with their intent and with our own holding that a joint venture arose on October 4, 1968, we now further hold that the McDougals were entitled to claim depreciation on Iron Card only until the transfer of October 4, 1968. Thereafter depreciation on Iron Card ought to have been deducted by the joint venture in the computation of its taxable income.

In determining their adjusted basis in the portion of Iron Card on whose disposition they are required to recognize gain, the McDougals charged all the depreciation which they had taken on the horse against their basis in the half in which they retained an interest. This procedure was improper. As in accordance with section 1.167(g)–1, Income Tax Regs., we have allowed the McDougals a depreciation deduction with respect to Iron Card for the period January 1 to October 4, 1968, computed on their entire cost basis in the horse of $10,000; so also do

---

[12] For example, if the obligation arose out of a loan, the obligee will recognize no income by reason of the transaction; if the obligation represents the selling price of a capital asset, he will recognize a capital gain to the extent that the amount he is deemed to have realized exceeds his adjusted basis in the asset; if the obligation represents compensation for services, the transaction will result in ordinary income to the obligee in an amount equal to the value of the interest which he received in the joint venture.

we require that the said deduction be charged against that entire cost basis under section 1016(a)(2)(A).[13]

As the McDougals were in the business of racing horses, any gain recognized by them on the exchange of Iron Card in satisfaction of a debt would be characterized under section 1231(a) provided he had been held by them for the period requisite under section 1231(b)[14] as it applies to livestock acquired before 1970. In that as of October 4, 1968, Iron Card had been used by the McDougals exclusively for racing and not for breeding, we do now hold that they had held him for a period sufficiently long to make section 1231(a) applicable to their gain on the transaction. This is the case although the McDougals may have intended eventually to use Iron Card for breeding purposes, *Anderson Fowler*, 37 T.C. 1124 (1962).

The joint venture's basis in Iron Card as of October 4, 1968, must be determined under section 723 in accordance with the principles of law set forth earlier in this opinion. In the half interest in the horse which it is deemed to have received from the McDougals, the joint venture had a basis equal to one-half of the McDougals' adjusted cost basis in Iron Card as of October 4, 1968, i.e., the excess of $5,000 over one-half of the depreciation which the McDougals were entitled to claim on Iron Card for the period January 1 to October 4, 1968. In the half interest which the venture is considered to have received from McClanahan, it can claim to have had a basis equal to the amount which McClanahan is considered to have realized on the transaction, $30,000. The joint venture's deductions for depreciation on Iron Card for the years 1968 and 1969 are to be determined on the basis computed in the above-described manner.[15]

---

[13] The depreciation on Iron Card to which the McDougals are entitled, their adjusted basis in the horse as of Oct. 4, 1968, and the gain recognized by them by reason of the transaction on that date remain to be determined in accordance with the decision under Rule 155, Tax Court Rules of Practice and Procedure.

[14] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

(C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221.

\*    \*    \*    \*    \*    \*    \*

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for *draft, breeding, or dairy purposes,* and held by him for 12 months or more from the date of acquisition. Such term does not include poultry. [Emphasis added.]

[15] These depreciation deductions are to be computed under Rule 155.

When an interest in a joint venture is transferred as compensation for services rendered, any deduction which may be authorized under section 162(a)(1) by reason of that transfer is properly claimed by the party to whose benefit the services accrued, be that party the venture itself or one or more venturers, sec. 1.721–1(b)(2), Income Tax Regs. Prior to McClanahan's receipt of his interest, a joint venture did not exist under the facts of the case at bar; the McDougals were the sole owners of Iron Card and recipients of his earnings. Therefore, they alone could have benefited from the services rendered by McClanahan prior to October 4, 1968, for which he was compensated by the transaction of that date. Accordingly, we hold that the McDougals are entitled to a business expense deduction of $30,000, that amount being the value of the interest which McClanahan received. Respondent has contended that a deduction of $30,000 would be unreasonable in amount in view of the nature of the services for which McClanahan was being compensated. But having found that the transaction under consideration was not a gift but rather was occasioned by a compensation arrangement which was entered upon at arm's length, we must reject this contention. See sec. 1.162–7(b)(2), Income Tax Regs.

In respect of the second issue presented, we hold that the McClanahans improperly failed to include $500 in their gross income for the year 1969.

The McClanahans have claimed that on May 12, 1969, McClanahan opened an account with Ruidoso by depositing $500, which consisted of $478 withdrawn from McClanahan's account at the Coronado State Bank on April 30, 1969, and $22 of pocket money. In fact McClanahan's account at Ruidoso had been opened long before May 12, 1969. We have made our holding in respect of the second issue in view of the burden placed on the McClanahans under *Thomas B. Jones*, 29 T.C. 601 (1957), and of the discrepancy in their explanatory evidence.

*Decisions will be entered under Rule 155.*