T.C. Memo. 2013-233

UNITED STATES TAX COURT

PHILIP D. LONG a.k.a. PHIL LONG, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26552-10.                         Filed October 21, 2013.

Philip D. Long, pro se.

Kimberly A. Daigle, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent issued a notice of deficiency

determining a $1,430,743 deficiency in the petitioner's federal income tax and a

$286,148.60 accuracy-related penalty under section 6662(a) for the 2006 tax year.

Unless otherwise indicated, all section references are to the Internal Revenue Code

[*2] as in effect for the 2006 tax year, and all Rule references are to the Tax Court Rules of Practice and Procedure. The respondent is referred to as the IRS. The petitioner is referred to as Long.

The only issues remaining to be resolved are:

(1)   Is Long entitled to a deduction for $238,543.71 in legal fees in addition to the $829,922 in legal fees determined to be deductible in the notice of deficiency? (At trial Long waived the issue of the deductibility of the $238,543.71 in legal fees; he is therefore not entitled to that deduction.)

(2)   Of the $5.75 million that Long received from Louis P. Ferris, Jr., is $600,000 excludable from Long's income on the theory that this amount was the share of earnings attributable to Long's alleged joint venture partner, Steelervest, Inc.? (We find there was no joint venture; Long must therefore include the $600,000 in his income.)

(3)   Is the character of the $5.75 million received by Long capital or ordinary? (We hold that the income is ordinary.)

(4)   Is Long entitled to cost of goods sold of $2,440,861, as claimed on his return, or $1,655,562, as determined in the notice of deficiency? (We hold that the allowable amount is $1,655,562.)

**[*3]** (5) Is Long liable for the accuracy-related penalty pursuant to section 6662(a)? (We hold that he is liable.)

FINDINGS OF FACT

The parties stipulated some facts; those facts are so found. Long resided in Fort Lauderdale, Florida, at the time the petition was filed.

Long was married to Susan Long until their divorce in September 2006.

Long was involved in various entities that conducted real estate development projects in Florida. The development projects often spanned several years.

Long owned and operated Las Olas Tower Co., Inc. (hereinafter "LOT"). LOT was incorporated in 1994 as a Delaware corporation. Long never filed any corporate income tax returns for LOT and treated the entity as a sole proprietorship, reporting its income and deductions on his Schedule C, "Profit or Loss From Business".[1] Long created LOT to design and build a luxury high-rise condominium building called the Las Olas Tower. The Las Olas Tower was to be built on land to be purchased from Las Olas Riverside Hotel (hereinafter "LOR").

---

[1]Neither Long nor the IRS urges that LOT be treated as other than a sole proprietorship for federal income tax purposes.

[*4] The land was on Las Olas Boulevard in Fort Lauderdale, Florida. In 1994, LOT began negotiations to purchase the land from LOR.

In 1995, LOT borrowed $300,000 from Steelervest, Inc., a corporation owned by Henry J. Langsenkamp III (hereinafter "Langsenkamp"). In addition to agreeing to repay the principal on the loan, LOT granted Steelervest an option to acquire 10% of an entity to which LOT promised to transfer ownership of the building to be constructed on Las Olas Boulevard. The loan agreement provided that if the 10% option was exercised by Steelervest, any distributions Steelervest received from the entity would reduce the loan principal LOT owed. Steelervest never exercised the 10% option. At some point, Steelervest made other loans to LOT beyond the initial $300,000. By 2001, the balances of all of Steelervest's loans to Long amounted to $748,000.

From 1997 through 2003, Long owned Alhambra Partners, Inc. (hereinafter "Alhambra"). Alhambra was formed to construct a luxury condominium building on Birch Road in Fort Lauderdale, Florida. To facilitate the project, Alhambra entered into a joint venture, called Alhambra Joint Venture, with Steelervest.[2]

---

[2]The parties stipulated the existence of the Alhambra Joint Venture. The second issue for decision relates to Long's assertion that there was a different joint venture with respect to the Las Olas Tower, which would allow him to exclude part of the $5.75 million received from Ferris.

[*5] Alhambra Joint Venture was responsible for constructing the Birch Road condominium building and selling the condominium units to customers.

From 1997 to 2001, Alhambra Joint Venture suffered significant losses. Steelervest lent $3,203,409.81 to Alhambra Joint Venture. The loan was guaranteed by Long and Susan Long.

In 2001, Steelervest entered into an agreement that restructured its legal and financial arrangements with the Longs and their related entities (i.e., LOT, Alhambra, and Alhambra Joint Venture). The agreement had four components:

- Steelervest forgave the $748,000 in loans it had made to LOT.[3]

- Steelervest released the Longs from their personal guaranties of the $3,203,409.81 loan Steelervest made to Alhambra Joint Venture.

- Alhambra, which was owned entirely by Long, transferred its interest in Alhambra Joint Venture to Steelervest, thus leaving Steelervest as the sole owner of Alhambra Joint Venture.

- Long agreed to pay Steelervest either (a) $600,000 in the event he sold his interest in LOT, or (b) 20% of LOT's net profits from the

---

[3]It is unclear from the record whether the agreement terminated Steelervest's option under the 1995 agreement to acquire 10% of the entity to be formed by LOT.

[*6]   development of the property on Las Olas Boulevard, if he did not sell his interest.

By the end of 2001, the units in the condominium building Alhambra Joint Venture developed on Birch Road were sold.

On June 20, 2002, LOT and LOR signed a contract, known as "the Riverside Agreement", obligating LOR to sell the property on Las Olas Boulevard to LOT for $8,282,800. The closing date of the contract was December 31, 2004.[4] The contract required LOT to use the property for no other purpose than as a multiunit residential building with at least 120,000 square feet of residential units and a height of at least 225 feet. When the contract was executed, Long intended that LOT would construct a condominium building and sell the condominium units.

Even before the December 31, 2004 closing date of the Riverside Agreement, the condominium building to be constructed on Las Olas Boulevard became Long's full-time project. Long hired architects to prepare the plans for the building. He sought to obtain a zoning permit from the city. He printed

---

[4]LOT had the option of accelerating the closing date to a date not earlier than June 4, 2003, provided it gave LOR nine months' written notice of the new closing date.

[*7] promotional materials about the building.  Operating out of his business office, Long negotiated contracts with purchasers of condominium units.  He obtained deposits for 20% of the units in the building.

Before the closing date of the Riverside Agreement, the president of LOR died.  His heirs did not wish to go through with the Riverside Agreement.  They terminated it in February 2004.

In March 2004, LOT sued LOR in the 17th Judicial Circuit Court for Broward County, Florida, to enforce its rights under the Riverside Agreement.  The suit against LOR included claims for specific performance of the Riverside Agreement, damages incident to a decree of specific performance, declaratory relief, and tortious interference with contract.  By the time of the lawsuit, Long had decided that instead of constructing the condominium building, LOT would sell the land, ready for construction, to a purchaser.  Langsenkamp filed a motion to intervene in the suit in order to be kept apprised of its status.  On November 21, 2005, the 17th Judicial Circuit Court for Broward County, Florida, found in favor of LOT on all claims except tortious interference.  The state court ordered specific performance and required LOR to close the contract within 326 days.  In addition, it ordered LOR to pay monetary damages to LOT, the amount of which was to be determined later.  The order explained that the purpose of the monetary damages

**[*8]** was to compensate LOT for the delay between the original closing date (December 31, 2004), and the earliest date that LOR would be compelled to fulfill its obligations under the Riverside Agreement (326 days from November 21, 2005). LOR, dissatisfied with the outcome of the suit, appealed the decision. During the appeal Louis P. Ferris, Jr. (hereinafter "Ferris"), offered to purchase LOT's position in the lawsuit against LOR.

Meanwhile, in August 2006 Long and Steelervest renegotiated the fourth component of their 2001 agreement. Long agreed that LOT would pay Steelervest 50% of the proceeds of the first $1.75 million, up to a maximum of $875,000, of any moneys received by LOT as a result of LOT's lawsuit against LOR or the development of the condominium building on Las Olas Boulevard. In a separate agreement, Steelervest lent Susan Long $200,000. The loan was secured by a mortgage on real property owned by Long and Susan Long. The $200,000 loan agreement is not in the record. From the testimony, it appears to us that Steelervest and Long agreed that Long's repayment of the $200,000 loan would reduce the amount Long owed under the August 2006 agreement. Thus, if Long were to repay the $200,000 loan, the maximum amount he would owe under the August 2006 agreement would be $675,000, not $875,000.

[*9]   On September 13, 2006, LOT assigned its position in its lawsuit against LOR, and all rights arising under the Riverside Agreement, to Ferris for a purchase price of $5.75 million.[5]  In this agreement (hereinafter the "Ferris-LOT assignment agreement"), Ferris and LOT "acknowledge that $650,000 of the purchase price [i.e., $650,000 of the $5.75 million] is allocated towards reimbursement of attorneys' fees incurred by Seller [i.e., by LOT]."  Earlier the same day, the Longs, who were then in divorce proceedings, entered into an agreement to resolve their respective claims to each other's assets.  This agreement (hereinafter the "marital settlement agreement") was contingent on the execution of the Ferris-LOT assignment agreement.  Pursuant to the marital settlement agreement, Susan Long released any interest in LOT that she had acquired because of her marriage to Long.  In exchange, Long agreed to pay Susan Long $2 million from the $5.75 million payment from Ferris.  Long also agreed to make an additional $1,963,828 in payments to various third parties,[6] including $800,000 to Steelervest.

---

[5]The parties to the Ferris-LOT assignment agreement were LOT and Ferris, although Long signed in both his individual capacity and as president of LOT.

[6]Long agreed to pay certain creditors and have them release Susan Long from any claims.

**[*10]** At the time that LOT sold its lawsuit to Ferris, Long was the sole owner of LOT. After the sale Ferris dropped the appeal; and the 17th Judicial Circuit Court of Broward County, Florida, entered an order (1) vacating its earlier judgment and (2) dismissing the lawsuit with prejudice.

As agreed in the Ferris-LOT assignment agreement, Ferris paid Long $5.75 million for LOT's position in the lawsuit and its rights in the Riverside contract. As required by the marital settlement agreement, Long paid Susan Long $2 million and various third parties $1,963,828. These payments included an $800,000 payment to Steelervest. In consideration of the $800,000 payment, Steelervest executed an agreement releasing the Longs and LOT from any claims, including any claims based on the August 2006 agreement and the $200,000 loan.

Long filed a Form 1040, "U.S. Individual Income Tax Return", for 2006. He attached a Schedule C to report the income and expenses of LOT. The Schedule C stated that Long's trade or business was "real estate developer". On the Schedule C, Long reported $1,896,824 of the $5.75 million payment as ordinary income; he did not report the remaining $3,853,176. On the Schedule C, Long reported cost of goods sold of $2,440,681. He did not claim a deduction for legal-and-professional-services expenses on his return. He reported that his tax

[*11] liability for the year was zero. Long discussed the ordinary character of the

$5.75 million payment with his accountant, but no other aspects of the return.

The IRS timely issued a notice of deficiency on September 2, 2010,

determining a deficiency in tax for 2006 of $1,430,743. The notice made the

following noncomputational adjustments to the amount Long reported as income

on his return:

| Item | Amount reported by Long on his return | Amount of adjustment in notice of deficiency | Adjusted amount in notice of deficiency |
| --- | --- | --- | --- |
| Schedule C gross receipts | $1,896,824 | $3,853,176 | $5,750,000 |
| Schedule C cost of goods sold | 2,440,681 | -1,655,562 | 785,119 |
| Schedule C legal-and-professional-services deduction | -0- | 829,922 | 829,922 |

In his petition, Long made a blanket statement disputing the deficiency and

penalty determined in the notice of deficiency. In addition, the petition contained

the following specific allegations:

[*12] ●     The $5.75 million payment from Ferris is excludable from Long's income to the extent of $600,000 he paid to Steelervest.[7]

●     The IRS erred in adjusting the cost of goods sold to $1,655,562.

●     Long is entitled to deduct $238,543.71 in legal fees (in addition to the $829,922 determined to be allowable as a deduction in the notice of deficiency).

At trial Long asserted that the character of any income from the $5.75 million payment was capital, not ordinary. At trial Long waived his claim that he is entitled to deduction of $238,543.71 for legal fees.[8]

## OPINION

The taxpayer generally bears the burden of proving that the determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Pursuant to section 7491(a), the burden of proof may be shifted to the IRS. However, Long has not established that he has met the

---

[7]Long paid Steelervest a total of $800,000, which included the $200,000 mortgage loan repayment for Susan Long. Long asserted that only $600,000 of his payment to Steelervest should be excluded from income.

[8]At the end of trial the IRS moved to amend its answer to assert that Long earned $75,000 in cancellation-of-indebtedness income. We denied this motion in a separate order.

[*13] conditions for such a shift.  See sec. 7491(a)(1) and (2); Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012). Consequently, he still bears the burden of proof.

1.    Deductions for legal fees

In his petition, Long sought a deduction for $238,543.71 in legal fees, in addition to the $829,922 in legal fees determined to be allowable as a deduction in the notice of deficiency.  At trial, Long conceded the issue of the deductibility of the $238,543.71 in legal fees by stating:  "I've agreed to give up on the additional legal fees."  On brief, Long attempted to revive his claim that he was entitled to the $238,543.71 deduction.

A concession made on the record by a taxpayer during trial is the equivalent of a stipulation.  Church of Scientology v. Commissioner, 83 T.C. 381, 524 (1984) ("[A] concession in open court * * * [is] the equivalent of a stipulation."), aff'd, 823 F.2d 1310 (9th Cir. 1987).  A taxpayer is bound by his or her stipulations. Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997), aff'd without published opinion, 208 F.3d 205 (3d Cir. 2000).  Thus, Long's concession is binding.

Even if Long had not conceded the issue, his claim for a deduction for $238,543.71 in legal fees would have failed for lack of proof.  Taxpayers are

**[\*14]** required to maintain records sufficient to establish the amounts of allowable deductions and to enable the IRS to determine the correct tax liability. Sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999). It is a general rule, established in Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), that if the trial record provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to fully substantiate the precise amount of the deduction, the Court may estimate the amount of the deductible expense and allow a deduction to that extent. In making such estimates, the Court may bear heavily against the taxpayer, who caused the inexactitude. Id. at 544. For the Court to estimate the amount of an expense, there must be some basis on which an estimate may be made. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Because the IRS has already determined that Long is entitled to a deduction for $829,922 in legal fees, Long's assertion that he is entitled to an additional $238,543.71 in legal fees is tantamount to a claim that he is entitled to a deduction of legal fees of $1,068,465.71 (the sum of $829,922 and $238,543.71). There is some evidence in the record that $650,000 in legal expenses was incurred in relation to LOT's lawsuit against LOR. Long also moved the admission of a letter from his law firm referring to $238,543 in fees. However, the letter was not a business record and

**[\*15]** was excluded from evidence. Long testified about the $238,543, but the testimony was too vague and inconsistent to establish a basis for estimating what he spent on legal fees. See Williams, 245 F.2d at 560; Vanicek v. Commissioner, 85 T.C. at 742-743. We hold that no deduction for legal expenses is available to Long beyond the $829,922 determined in the notice of deficiency.

2.      The excludability from income of $600,000 of the $5.75 million Long
        received from Steelervest

In 2006, Long agreed that LOT would pay Steelervest 50% of the proceeds of the first $1.75 million, up to a maximum of $875,000, of any moneys LOT received as a result of LOT's lawsuit against LOR or the development of the condominium building on Las Olas Boulevard. Later in 2006, Long received $5.75 million from Ferris and paid Steelervest $600,000 of the proceeds. The $200,000 loan to Susan Long was also repaid to Steelervest. Long now claims that his August 2006 agreement with Steelervest created a joint venture and that the $600,000 portion of the $5.75 million was Steelervest's taxable share of the income of the joint venture.[9] The IRS contends that there was no joint venture

---

[9]Implicitly, Long argued that the $5.75 million payment was income of the joint venture and that $5.15 million of the joint venture's income was his taxable share. His express contention was that $600,000 of the $5.75 million payment is Steelervest's income, not his.

[*16] between Long and Steelervest. In its view, the entire $5.75 million is the income of Long.

A joint venture "has been defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation,' and also as 'an association of persons to carry out a single business enterprise for profit.'" Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 848-849 (1957) (citing 48 C.J.S. Joint Adventures, secs. 1 and 2, Estate of Koen v. Commissioner, 14 T.C. 1406 (1950), and Osborn v. Commissioner, 22 B.T.A. 935, 945 (1931)). The existence of a joint venture "is a question of fact to be determined by reference to the same principles that govern the question of whether persons have formed a partnership * * * for tax purposes." Luna v. Commissioner, 42 T.C. 1067, 1077 (1964). The required inquiry for determining the existence of a partnership for federal income tax purposes is whether the parties "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." Commissioner v. Tower, 327 U.S. 280, 287 (1946). The parties' intentions are a matter of fact, "to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" Id. (quoting Drennen v. London Assurance Co., 113 U.S. 51, 56 (1885)). The Court in Luna v.

[*17] Commissioner, 42 T.C. at 1077-1078, distilling the principles established in Tower and Commissioner v. Culbertson, 337 U.S. 733 (1949), held that the following factors are relevant in evaluating whether parties intend to create a partnership for federal income tax purposes:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent [i.e., the IRS] or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

No single factor is conclusive of the existence of a partnership. Burde v. Commissioner, 352 F.2d 995, 1002 (2d Cir. 1965), aff'g 43 T.C. 252 (1964); McDougal v. Commissioner, 62 T.C. 720, 725 (1974). Examining each Luna factor, we determine that Long and Steelervest did not engage in a joint venture regarding LOT:

[*18] 1.  The August 2006 agreement provided only that Steelervest would receive a share of Long's profits from LOT.  Neither this agreement nor any prior agreements purported to create a joint venture.

2.  Steelervest did contribute money.

3.  Besides its profit share, Steelervest had no right to control LOT's assets or to receive money from LOT.

4.  Steelervest's interest in LOT's profits was capped at $875,000 and it had no liability for LOT's losses.

5.  Neither Long's ownership of LOT nor LOT's operations were conducted in Steelervest's name.

6.  Long and Steelervest did not file partnership returns or otherwise represent to the IRS or others that there was a joint venture.

7.  No evidence shows that separate books of account of any joint venture were maintained.

8.  Long possessed all control over his ownership interest in LOT and over LOT's operations; there was no control by Steelervest.

On the basis of these factors, we find that Steelervest was not in a joint venture with Long regarding Long's investment in LOT or in LOT's operations.

[*19] Thus, Long must include the entire $5.75 million payment in his income. See sec. 61(a).

3.    Capital-versus-ordinary character of the $5.75 million payment

Pursuant to the Ferris-LOT assignment agreement, LOT sold its position in its lawsuit against LOR, and all rights arising under the Riverside Agreement, to Ferris. In exchange it received $5.75 million from Ferris.

In its suit, LOT requested specific performance of a sales contract for the property on Las Olas Boulevard. The Florida court awarded specific performance, ordering LOR to sell the property to LOT. In exchange for this right of specific performance, LOT received $5.75 million. Therefore, the character of the $5.75 million in income depends upon whether Long intended to acquire the Las Olas Boulevard property for investment.

The IRS contends that Long intended to have LOT construct a condominium building on the land and sell condominium units. The IRS asserts that the condominium units are not capital assets under section 1221(a)(1), which provides that "property held by the taxpayer primarily for sale to customers in the ordinary course of * * * [the taxpayer's] trade or business" is not a capital asset. Long argues that he intended to sell the land to a "developer", which seems to mean he expected the purchaser to construct the building.

[*20] A threshold question regarding the application of section 1221(a)(1) is whether the "property" Long intended to sell is (1) the land, (2) the land plus the building, or (3) the individual condominium units. As discussed, the IRS contends that Long intended to sell the condominium units. Long contends that he intended to sell the land (ready for construction). While we agree with Long that he intended to sell the land (ready for construction), we hold that the character of the income is ordinary. Recall that:

- In 1999 LOT began negotiations to buy the land from LOR.

- In June 2002 LOR agreed to sell the land to LOT with a closing date of December 2004.

- In February 2004 LOR terminated the Riverside Agreement.

- LOT sued LOR for specific performance of the Riverside Agreement.

As of June 2002, Long's intention was that LOT would construct the building and sell the units. However, by the time LOT filed suit against LOR, Long had changed his mind and decided to have LOT sell the property before completion of the building. It was Long's intent at this time that informs our view of the nature of the claims asserted in the lawsuit. See Rice v. Commissioner, T.C. Memo. 2009-142 (looking to the taxpayer's intent at the time property was disposed of); Raymond v. Commissioner, T.C. Memo. 2001-96. At the time he sold his rights

**[*21]** under the Riverside Agreement and to the lawsuit to Ferris, Long intended to sell the land to another developer. Therefore, the applicability of section 1221(a)(1) depends on whether Long intended to sell the land to customers in the ordinary course of his business.

Income from the sale of a capital asset is capital in character. <u>See</u> sec. 1221; sec. 1.1221-1(a) and (b), Income Tax Regs. Under section 1221(a)(1), property is not a capital asset if it is "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer * * * or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". The Supreme Court has defined "primarily" in this context to mean "principally" or "of first importance". <u>Malat v. Riddell</u>, 383 U.S. 569, 572 (1966); <u>see also</u> <u>Biedenharn Realty Co. v. United States</u>, 526 F.2d 409, 422-423 (5th Cir. 1976). The question of whether property is held primarily for sale to customers in the ordinary course of a taxpayer's business requires a factual analysis. <u>Pritchett v. Commissioner</u>, 63 T.C. 149, 162 (1974). Typically, the factors in making this determination include: (1) the taxpayer's purpose in acquiring the property; (2) the purpose for which the property was subsequently held; (3) the taxpayer's everyday business and the relationship of the income from the property to the taxpayer's total income; (4) the frequency, continuity, and

**[\*22]** substantiality of sales of property; (5) the extent of developing and improving the property to increase the sales revenue; (6) the extent to which the taxpayer used advertising, promotion, or other activities to increase sales; (7) the use of a business office for sale of property; (8) the character and degree of supervision or control the taxpayer exercised over any representative selling the property; and (9) the time and effort the taxpayer habitually devoted to sales of property.  Biedenharn Realty Co., 526 F.2d at 415-422; United States v. Winthrop, 417 F.2d 905, 910-911 (5th Cir. 1969).  The frequency and substantiality of sales is especially probative.  Suburban Realty Co., 615 F.2d 171, 178 (5th Cir. 1980).  The purpose of the section 1221(a)(1) exclusion is to "differentiate between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time."  McManus v. Commissioner, 65 T.C. 197, 212 (1975) (citing Malat, 383 U.S. at 572), aff'd, 583 F.2d 443 (9th Cir. 1978).

We first examine Long's purpose for attempting to acquire the property on Las Olas Boulevard.  At the time of the lawsuit Long intended that LOT would acquire the Las Olas Boulevard property, develop a condominium building (i.e., design the building and navigate the zoning-approval process), and then sell the land to a purchaser.  This intention is consistent with the proposition that the Las

[*23] Olas Boulevard property, like the units in the condominium building on Birch Road (which Long had bought and sold), would be held by Long primarily for sale to his customers. See Sykes v. Commissioner, 57 T.C. 618, 625 (1972) ("Nor does the fact that nearly half of petitioner's sales in 1967 and 1968 were made to one customer preclude his being engaged in a business."); see also Pointer v. Commissioner, 48 T.C. 906, 917 (1967) (finding a limited customer base, such as two customers, meets the requirements under section 1221), aff'd, 419 F.2d 213 (9th Cir. 1969).

We also consider the taxpayer's everyday business and the relationship of the income from the property to the taxpayer's total income. Long's full-time activity was developing the land for the condominium building on Las Olas Boulevard. Although this activity was interrupted by the termination of the Riverside Agreement, which required Long to divert his energies to supervising LOT's lawsuit against LOR, Long presumably would have soon gone back to developing the condominium building had he not struck a deal with Ferris.

We also consider the frequency, continuity, and substantiality of Long's sales. We believe that Long initially intended to sell all the units in the yet-to-be-constructed condominium building. He received deposits for 20% of the units. Although Long changed his plans and decided to sell the land ready for

[*24] construction of a building--and not the building units--this does not alter our view that Long held the land primarily for sale to customers in the ordinary course of business. The sale of a parcel of land (ready for construction) would result in a large profit from a single-sale transaction. The profit would have been from Long's efforts to develop the land, not from the mere passage of time.

We consider the extent to which the taxpayer developed and improved the property. Long used substantial efforts to develop the property: he hired architects, he obtained a zoning permit, he printed promotional materials, he negotiated contracts with residential customers, and he obtained deposits.

We consider the extent to which the taxpayer used advertising, promotion, or other activities to increase sales. Through his sales efforts, Long received deposits on 20% of the units. Had Long sold the land to a single buyer, we believe he would have overseen the sale.

We consider whether a business office was used. Long used a business office to sell the condominium units. However, he may not have used a business office to effect a sale of the land.

We consider the character and degree of supervision or control Long exercised over any representative selling the property. Long would have been

[*25] primarily responsible for selling the land (if he had not sold the rights under the Riverside Agreement and the lawsuit).

We also consider the time and effort the taxpayer habitually devoted to sales of property. Long was a professional in the real-estate industry. His full-time business was developing and selling condominium properties.

On the basis of our consideration of these factors, we find that the preponderance of evidence demonstrates that Long intended that the land subject to the Riverside Agreement would have been property held by Long primarily for sale to his customers in the course of his business. Thus, if Long had not sold LOT's rights under the Riverside agreement and lawsuit against LOR, he would have earned ordinary income through LOT after the state court had ordered specific performance of the Riverside Agreement. Accordingly, we hold that the $5.75 million payment is correctly treated as giving rise to ordinary income.

4.    Cost of goods sold

The notice of deficiency determined that cost of goods sold should be $1,655,562 rather than the $2,440,681 amount reported on Long's return. Long's petition challenged this $785,119 reduction. But at trial he provided no evidence to support the disputed cost-of-goods-sold amount. Consequently, we hold that cost of goods sold is $1,655,562.

[*26] 5.     Accuracy-related penalty pursuant to section 6662(a)

Section 6662(a) and (b)(2) imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax attributable to any substantial understatement of income tax. By definition, an understatement of income tax for an individual is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1). Under section 7491(c), the IRS bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in this case. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the IRS meets this burden, the taxpayer must come forward with persuasive evidence that the IRS's determination is incorrect. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447. A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability with respect to a portion of an underpayment if the taxpayer can show, under section 6664(c)(1), that the taxpayer had reasonable cause for that portion and that the taxpayer acted in good faith with respect to that portion. Section 1.6664-4(b)(1), Income Tax Regs., provides:

> The determination of whether a taxpayer acted with reasonable cause
> and in good faith is made on a case-by-case basis, taking into account
> all pertinent facts and circumstances. * * * Generally, the most
> important factor is the extent of the taxpayer's effort to assess the
> taxpayer's proper tax liability. Circumstances that may indicate

[*27] reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith. * * * Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * *

Whether the taxpayer acted with reasonable cause and in good faith thus depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess the proper tax liability, the taxpayer's knowledge and experience, and the extent to which the taxpayer relied on the advice of a tax professional.

There are other defenses to the penalty: section 6662(d)(2)(B) provides that an understatement is reduced, first, where there is substantial authority for the taxpayer's treatment of any item giving rise to the understatement or, second, where the relevant facts affecting the treatment of any item giving rise to the understatement are adequately disclosed in the return and the taxpayer had a reasonable basis for the treatment of that item.

Long understated his 2006 income tax liability by $1,430,743, an amount which is greater than 10% of the amount required to be shown on his return, $143,074, which is greater than $5,000. Therefore, the IRS has met its burden of producing evidence that imposing the penalty is appropriate.

**[\*28]** The evidence does not provide grounds for the reasonable-cause, substantial-authority, or reasonable-basis defenses. Long consulted with his tax return preparer about the character of the income (i.e., ordinary versus capital) from the $5.75 million payment. The two decided to report the income as ordinary, but that is not the aspect of the return that the IRS challenged. With respect to the challenged portions of his return (the portions that we hold result in the underpayment) the evidence does not show that (1) he provided enough information to his return preparer or that (2) he relied on his return preparer's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Accordingly, we hold that Long is liable for the section 6662(a) penalty for 2006 because he substantially understated his income tax.

We have considered all other arguments made by the parties, and to the extent that we have not discussed them, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for respondent.